IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL ACTION |
| LUCY XI, | NO. 16-22-5 |
| Defendant. | |

## OPINION

**Slomsky, J.**                                                                                     **July 6, 2018**

## I.      INTRODUCTION

On January 5, 2016, Defendant Lucy Xi was arrested in Thousand Oaks, California, at Amgen, her place of employment.[1]  Following her arrest, she was interviewed by Special Agents David Winsett, Lisa Grover, and Jeremy Creed of the Federal Bureau of Investigation ("FBI"). Thereafter, a forty-five count Superseding Indictment was returned against the five Defendants, Yu Xue, Tao Li, Yan Mei, Tian Xue, and Lucy Xi.  Defendant Xi is charged with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count 1); conspiracy to steal trade secrets, in violation of 18 U.S.C. § 1832(a)(5) (Count 2); wire fraud, in violation of 18 U.S.C. § 1343 (Counts 4-19); and theft of trade secrets, in violation of 18 U.S.C. § 1832(a) (Counts 23-25). (Doc. No. 125.)  The charges stem from an alleged conspiracy to steal confidential and trade secret information from GlaxoSmithKline, LLC ("GSK") for the use of a rival corporation, Renopharma, Ltd., created in China.

---

[1]    The United States Attorney had filed a Criminal Complaint against Defendants Yu Xue, Tao Li, Yan Mei, Tian Xue, and Lucy Xi.  They were charged with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.  (Doc. No. 1.)  Warrants for the arrest of Defendant Lucy Xi and the other four persons were issued by a United States Magistrate Judge on December 29, 2015.

Before the Court is Defendant Xi's Motion to Suppress statements she made to FBI Agents after she was taken into custody and invoked her right to counsel, as well as any evidence derived directly or indirectly from her statements. (Doc. No. 160.) The Government has filed a Response to her Motion to Suppress (Doc. No. 168), and Defendant Xi has filed a Reply (Doc. No. 178). On April 30, 2018, the Court held a hearing on all pretrial Motions, including the instant Motion to Suppress. For reasons that follow, Defendant Xi's Motion to Suppress (Doc. No. 160) will be granted.

## II. FINDINGS OF FACT[2]

Defendant Lucy Xi was born in China and has lived in the United States for approximately fifteen years. (Doc. No. 168-1 at 2; Doc. No. 186, Ex. A at 32.) She has advanced degrees from universities in the United States and has taken courses in English. (Doc. No. 168-1 at 3.) Although her primary language is Mandarin, she speaks and understands English. (See Doc. No. 186, Ex. A.) She was formerly employed by GSK in the biopharmaceutical development department. (Doc. No. 168-1 at 2.) In 2015, she moved to Thousand Oaks, California to work for Amgen, a biotechnology company. (See Doc. No. 186, Ex. A.)

---

[2] At the April 30, 2018 hearing on the Motion to Suppress, the Government did not present witness testimony because an audio recording was made by FBI Agents of their interview with Defendant Xi. The Findings of Fact are taken from the transcript of the recording, the audio recording of the January 5, 2016 FBI interrogation of Defendant Xi (Doc. No. 186, Ex. A), and Exhibits filed by the Government (Doc. Nos. 168-1 to 168-4).

The dialogue quoted throughout the Findings of Fact is based on listening to the audio recording of the interrogation carefully several times, as well as the transcript of the interrogation filed by the Government. Upon review of the audio recording, the Court has identified several inaccuracies in the transcript. Accordingly, the Court has made alterations to the transcript, which appear in brackets in this Opinion, to accurately reflect the recorded conversation.

On January 5, 2016, FBI Special Agents David Winsett, Lisa Grover, and Jeremy Creed arrested Defendant Xi at Amgen. (Id.) When the Agents approached her, Agents Winsett and Grover introduced themselves, and Agent Winsett informed Defendant Xi that she was under arrest. (Id. at 1.) The below conversation followed:

> [Winsett]: So if you could just turn around for a second and take your coat off and we'll explain everything to you, okay?
>
> [Xi]: What's going on?
>
> [Winsett]: Well, if you take your coat off and let us put the handcuffs on you and give us a second, we'll explain the whole situation to you, okay? You are under arrest by the FBI.
>
> [Xi]: This is not a joke?
>
> [Winsett]: No, this is not a joke.
>
> [Xi]: What's going on?
>
> [Winsett]: Well, we need to put the handcuffs on you and explain the situation to you, okay?
>
> [Xi]: Okay.

(Id.) Defendant Xi was handcuffed. (Id.) Agent Winsett then showed her the arrest warrant and asked her whether it was her name on the warrant. (Id. at 1-2.) Defendant Xi responded, "Mm-hmm. What['s the reason]? I didn't do anything wrong." (Id.)

Agent Winsett informed her that she had been charged with conspiracy to commit wire fraud and that the Agents would explain some of it to her. (Id. at 2.) The following ensued:

> [Xi]: What's wire fraud? I don't understand.
>
> [Winsett]: Uh, wire fraud is when you transmit, uh, something that is illegal over [say, the] internet. That's what wire fraud is.
>
> [Xi]: [I never do anything like that].

[Winsett]: That's okay.  So, let me—let me read this to you.  Okay.  In America we have what's called the Miranda Rights,[3] the advice [of] rights.  [Have you—] Do you understand this?

[Xi]: So, just tell me what's wire fraud?  It's about money or about what?

[Winsett]: Uh, it's about some information that I think you possibly had access to at your previous employer.  Information, Okay?

[Xi]: No I never trans[fer] anything to anybody.

[Winsett]: Okay. Well, let me—let me read this to you first, okay?  And then—so you can understand—

[Xi]: I think, uh, there must be something wrong.  I never trans[ferred] anything to anybody.

(Id.)  Agent Winsett then introduced Agent Creed, and Defendant Xi reiterated that there must have been a misunderstanding.  (Id.)

Next, Agent Winsett advised Defendant Xi of her Miranda rights and said as follows:

[Winsett]: Okay. Well, let me read this to you, your advice of rights, and I know this is very alarming for you and we want to help you—

[Xi]: No, I never co[nducted] anything.  I never—[leak] any confidential information to anybody.

[Winsett]: Okay [well—],

[Xi]: I'm pretty sure I'm innocent.

[Winsett]: Okay.  Well, let me read this to you first.  I know you're quite alarmed[.]  [I know] this is an alarming process for you.  So this is your advice of rights.  Before we ask you any questions, you must understand your rights.

[Xi]: Mm-hmm.

[Winsett]: You have the right to remain silent.  Okay?  You don't have to say anything.  Anything you say can be used against you in court.  You have [the] right to talk to a lawyer for advice before we ask you any questions.  Do you understand that?

[Xi]: Yeah.

---

[3]    Miranda v. Arizona, 384 U.S. 436 (1966).

[Winsett]: You have the right to talk to a lawyer for advice before we ask you any questions.  You have the right to have a lawyer with you during questioning.

[Xi]: Okay.

[Winsett]: If you cannot afford a lawyer, <u>no one</u> will be appointed for you before any questioning, if you wish.  Okay?

[Xi]: Yeah.

[Winsett]: If you decide to answer questions now without a lawyer present, you have the right to stop answering questions at any time.

[Xi]: That's fine.

[Winsett]: Do you understand all of this?

[Xi]: [Actually,] I'm confident I didn't do anything wrong, so, yeah.[4]

(<u>Id.</u> at 3 (emphasis added).)  Agent Winsett then asked Defendant Xi to read the words written beneath the section of the FBI Advice of Rights Form titled "Consent."  (<u>Id.</u>)  The words on the Advice of Rights Form appear in small font, probably an eight-point font or less.  It is attached as Exhibit A.  Defendant Xi next read aloud just the following sentence from the form: "I'm reading this statement of my rights and I understand what my rights are and at this time I'm willing to answer questions without a lawyer present."  (<u>Id.</u>)  The exchange below then occurred:

[Winsett]: Okay, so, this is what you have read and so I am asking you, do you want to answer any questions without a lawyer present? If you do not want to answer any questions you do not have to.  If you would like to have a lawyer present, we will not ask you any questions, and [and—] that will stop.  The questions will stop or if you feel confident answering—

[Xi]: I would like to a[ssist] because I'm very confident I didn't do anything wrong and I want to know what this is about.

[Winsett]:  Okay, so you understand then?  So you are willing to speak to us—

[Xi]: Ye[s].

---

[4]    Although Defendant Xi's response includes the statement, "so, yeah," her answer to Agent Winsett's question of whether she understood the warnings appears to be ambiguous since she was concentrating on whether she did anything wrong.

[Winsett]: Without a lawyer present?

[Xi]: Ye[s].

(Id. at 3-4.)

After Defendant Xi agreed to speak with the Agents without a lawyer, Agent Winsett took the handcuffs off of her, and Agent Grover searched her. (Id. at 4.) Defendant Xi asked, "This wouldn't affect my [employment] here, right?" (Id.) She continued, "I'm a single mom and this is the only job I have." (Id.) Agent Winsett stated, "I can't comment on that. Um, but I think the more cooperative you are, it will probably be to your benefit. It will be helpful for you. That decision is not for us to make. But, again, if you are cooper— " (Id.) Defendant Xi interjected, "[No, I totally believe this is a misunderstanding or something wrong, so you (UI)[5] . . . employment (UI) . . . would be really bad.]" (Id. at 5.) She stated, "I hope I can get this sorted out and [clarify] or something." (Id.) Agent Winsett responded, "Okay well, we appreciate any assistance that you could provide for us and in cases like this, uh, you know, cooperation, uh, does—it can sometimes, work in your benefit." (Id.) "Okay," answered Defendant Xi. (Id.) Agent Winsett then stated,

> So. Okay. So I apologize that I had to put handcuffs on you but that's the process of what we do in this country to arrest somebody. I know it's very alarming but, if you would like to sit down, we can explain some of this to you, you can have some water, and we can try and discuss this.

(Id.)

---

[5] The notation "(UI)" is used in the transcript to indicate unintelligible speech. (Doc. No. 186, Ex. A at 1.)

Agent Winsett then asked Defendant Xi, "So, since we have read you your Miranda Rights and you just verbally repeated it to us, can you sign this now as well?"[6] (<u>Id.</u>) Defendant Xi responded, "Mm-hmm." (<u>Id.</u>) Agent Winsett told Defendant Xi where to place her signature on the Advice of Rights Form, and Defendant Xi signed the form. (<u>Id.</u>)

After Defendant Xi signed the Advice of Rights Form, Agent Winsett asked her whether she had a daughter. (<u>Id.</u> at 5.) Defendant Xi said that she did, and Agent Winsett asked her whether she knew someone who could pick up her daughter from school in the event that she did not return from the Metropolitan Detention Center in time to do so herself. (<u>Id.</u> at 5-6.) Defendant Xi stated that she was new to the area. (<u>Id.</u> at 6.) Agent Winsett then said, "You're new in this area. Okay. Okay. We'll probably have to arrange for maybe CPS[7]—" (<u>Id.</u>) Agents Winsett and Creed then briefly discussed having CPS on standby. (<u>Id.</u>) Agent Winsett asked Defendant Xi again whether she had any friends that could pick up her daughter to which she responded that she could call one of her friends to see if she was willing to handle it. (<u>Id.</u>) Agent Winsett then stated, "Okay. Well, it's probably better if you—and to—just to kind of save face, if you wanted to call her now, we would prefer that and tell her that maybe you have to stay for a late project or something, um, so that you don't have to explain why you're here—" (<u>Id.</u> at 7.)

"But still, [I'm clueless, can you] just cut—cut to the point of like what I did wrong?" Defendant Xi asked. (<u>Id.</u>) Agent Winsett explained that they would talk about that but that they wanted to make sure that arrangements were made for her daughter. (<u>Id.</u>) The Agents and

---

[6] Although Agent Winsett says that Defendant Xi just verbally repeated the <u>Miranda</u> warnings to the Agents, there is no indication from the audio recording that she read the form on her own and verbally repeated the <u>Miranda</u> rights.

[7] The acronym CPS refers to Child Protective Services.

Defendant Xi discussed getting her cellular phone from her office so that she could make arrangements for her daughter. (Id. at 7-9.)

After Agent Grover went to retrieve Defendant Xi's cellular phone, Agent Winsett said to Agent Creed, "Okay. There is uh—There was the other—remember all that stuff, the print outs, the Power Point and all that stuff?" (Id. at 10.) Agent Creed responded, "Yes. I have them here." (Id.) "Okay. Can you give me some [of (UI)]?" asked Agent Winsett. (Id.) Agent Creed said, "Yeah." (Id.) Agents Winsett and Creed then showed Defendant Xi documents while asking her questions about what email addresses she used. (Id. at 10-11.)

At this point, Agent Winsett asked Defendant Xi whether she had worked at GSK. (Id. at 11.) Defendant Xi said yes. (Id.) Agent Winsett informed her that a search warrant had been served on GSK for her work laptop. (Id.) He told her that some information on her laptop had been sent to her personal email. (Id. at 12.) "What email accounts?" Defendant Xi asked. (Id.) Agent Winsett responded, "To your hotmail accounts apparently, it appears, uh, and your Gmail account." (Id.) A rustling of papers can be heard on the audio recording of the interview. "So, does this—does this look familiar to you?" asked Agent Winsett. (Id.) Agent Winsett showed documents to Defendant Xi. The conversation then proceeded as follows:

[Xi]: That's my friend.

[Winsett]: That's your friend?

[Xi]: Yeah.

[Winsett]: Yeah. Okay. So this is—Is this her research?

[Xi]: Ye[s].

[Winsett]: And how do you pronounce that name?

[Xi]: [Yu Xue.]

[Winsett]: [Yu Xue?]

[Xi]: Yeah, but [this is for my part-time PhD project], I believe.  [So I need to use] some of her, uh, like those are [just] common [domain] knowledge.  It's not [specific] to [like anybody, you know.]

[Winsett]: Uh-huh.

[Creed]: Uh-huh.

[Xi]: It's [public] to everybody.

[Winsett]: Right, but—

[Xi]: [So] I was helping her to provide some [analytical] data to her and [it was part of my part-time PhD] approved by GlaxoSmithKline.

(Id. at 12-13.)

Agent Winsett explained to Defendant Xi that the information was the property of GSK and that it was a crime to send the information to her personal email.  (Id. at 13.)  Defendant Xi continued to disagree.  (Id.)  Agent Winsett showed Defendant Xi various emails and chats between her and her husband.  (Id.)  She stated, "I don't believe there is something [related to Amgen or GSK] confidentiality information.  I'm very careful because I know I'm the single income for my family—"  (Id. at 14.)  Agent Winsett continued to state that Defendant Xi had committed a crime, explaining, "[You know, a] crime was committed.  Essentially information that belonged to GSK was transmitted to these other individuals that should not have received, uh, that information and you should not have had that information.  That is—that is the wire fraud aspect of the—"  (Id. at 15.)  Defendant Xi continued to disagree.  (Id.)

Next, Agent Winsett read to Defendant Xi an agreement that she signed when she worked for GSK regarding the use of GSK's information.  (Id. at 15-16.)  As he read, he inserted into the agreement the name Renopharma, which is the company that the Government alleges received the stolen GSK information.  Agent Winsett read:

Uh, and, Number three, ". . . That you will not during or at any time after the termination of your employment with the company use for yourself or for any

9

other companies such as [Renopharma] or individuals, any secret or confidential information, knowledge, or data, of or about the company, its business in that or, about the third parties generated by me or divulged to me during the period of my employment with the company."

(Id. at 16.) Agent Winsett then asked Defendant Xi whether her husband used her email, and she informed him that she was finalizing her divorce. (Id.) The conversation continued:

[Winsett]: Yeah. Okay. So this email, the mylucyxl@gmail, is that an email that your husband uses? Who uses this—this email?

[Xi]: My husband.

[Winsett]: Your husband. Okay, so you—apparently sent—you received this— you had this Power Point and then you sent it to your husband, correct?

(Id. at 16.)

At this point, just over twenty-two minutes into the interrogation, Defendant Xi responded: "I think I need a lawyer. I—I don't—I—I—I still don't believe [I] did anything wrong because I believe this is all, [public] uh, [knowledge]." (Id. at 17 (emphasis added); Audio Recording at 22:22.) The following exchange then ensued:

[Winsett]: Okay.

[Xi]: Yeah, so I didn't believe—I [didn't] believe—see, there's no[where] it says it's confidential. [Like], I worked for GSK [and Amgen], [if it] is confidential, the documents should [] mark[] as confidential.

[Winsett] Okay. Well—

[Xi]: So, I don't believe there is any secret here. It's part of my PhD project and, uh, my husband, I don't know how to use a special (UI)—tool to draw—

[Winsett]: Mm-hmm.

[Xi]: [draw]—

[Winsett]: Mm-hmm.

[Xi] Some of the moleculars.

[Winsett]: Mm-hmm.

[Xi]: And, uh, probably I was asking him to draw something for me because—

[Winsett]: Mm-hmm.

[Xi]: He knows how to [use a] (UI) draw—

[Winsett]: Mm-hmm.

[Xi]: That's a tool.  So, but, I don't think I can explain, uh, [in] detail[] to you guys [or] mak[e] it very clear—

[Creed]: Well, [who did your husband work for? Or your ex-husband,] excuse me. Where does your ex-husband work?

[Xi]: I don't recall what time was it.  Probably he doesn't have a job back then.

(Doc. No. 186, Ex. A at 17.)

A little over a minute after Defendant Xi asked for a lawyer, Agent Winsett stated, "Okay, so let me take it—let's take a step back here.  Do you want to continue to answer our questions or do you want to have a lawyer present?"  (Id. at 18; Audio Recording at 23:25.)  In response, the following conversation occurred:

[Xi]: I think I need a lawyer because []—I think the more I say, the more—if I don't say it accurately enough then it could get me in trouble.

[Winsett]: Okay.  Then we will stop the questioning now.  So you—we just want to be certain then, uh, uh, you want to have a lawyer present then, correct?

[Xi]: Uh, yea.  I don't have a lawyer and I don't know how to handle this.

[Creed]: When we—when we take you to, uh—

[Winsett]: Downtown LA.

[Creed]:  Downtown LA, they will provide you with a lawyer.  That—that—that will be fixed.

(Doc. No. 186, Ex. A at 18 (emphasis added).)

Thereafter, Defendant Xi asked whether she could call her friend to arrange for her daughter to be picked up from school.  (Id.)  She then asked, "How long all this take?  Will I be, like, [longer than one day, then] do I need to call my relatives?"  (Id.)  Agent Winsett explained

what would happen when she appeared before a judge.  (Id. at 18-19.)  Referring to documents still in front of her, Defendant Xi asked, "Um, so all I did was this wrong, right?  Those didn't have nothing to do with me."  (Id. at 19.)  She also stated, "That's not my email."  (Id.)  A rustling of papers can be heard on the audio recording.  (Audio Recording at 24:04-05.)

Agent Winsett and Defendant Xi then engaged in the following exchange:

[Winsett]: Well, again, Lucy, I don't want to continue to ask you questions—

[Xi]: I know they were—I know they were working on to set up [a] individual company, like a start up, but I don't have anything to do with it and I did not have a good relationship with my husband, I was excluded.  And I—I actually opt out.  I didn't want [to know] anything going [on].

[Winsett]: With all this.

[Xi]: Yes.  Yeah.

[Winsett]: [Okay.]  I appreciate the information that you'[re] giv[ing] to me.  So, again, um, do you want to continue to answer some of our questions without a lawyer present?  Or do you want us to stop asking you questions and you obtain an attorney later today?  Uh, it's up to you.  I'm not—uh, I don't want you to feel obligated or pressured to speak with us, uh, against your will.

[Xi]: See, this one is it to everybody, [right]?

[Winsett]: Right.

[Xi]: Yeah.

(Doc. No. 186, Ex. A at 19.)  The conversation continued:

[Winsett]: Now, Lucy, I believe it's possible that, you know, somehow you were tricked or—or maybe you misunderstood, you know, what these other individuals were doing and you tried to—to—to help or you were, you know, obviously trying to prepare for your PhD.  That's what we're trying to sort out.  If you want to talk about this now—

[Xi]: Mm-hmm.

[Winsett]: We can continue or again, I just want to be certain, whether or not you want to have a lawyer present.  I—I—

[Creed]: You need to make that clear to us.  Okay, Lucy?

[Xi]: Mm-hmm.

[Creed]: That you need to make it clear to us that you want to talk to us or that you want to have a lawyer. We—we want to be very careful about you being clear to us about that. So we can talk about this if you want or we can stop talking about it so you can get a lawyer. Those—those are—those [choices] are up to you.

[Xi]: I want to tell you what I know, um, which we can clear (UI) because really I need this job—

[Winsett]: Uh-huh.

[Xi]: I'm pretty sure I didn't do anything to betray my previous employer.

[Winsett]: Okay.

[Xi]: Yeah. I—I—I—was scrutinized, uh, very scrutinized to keep my job and did not get involved in their [business.]

[Winsett]: Uh-huh.

[Xi]: So, um—

[Winsett]: Uh, well, I will explain this to you [] in cases where individuals are arrested by the FBI, if they are willing and able to cooperate with us, uh, generally speaking, that—that helps their situation. Okay? That helps, uh, because then if you are able to cooperate with us we can then provide your information to the prosecutor and the Judge and that will help determine, you know, whether the charges are dropped or whether they are reduced, or whatever. Um, we cannot promise that any of that will happen but, in most cases, or in some cases, um, if cooperation is provided, uh, then it generally will make your situation better. Okay? So, I—I want you to understand that. If you choose not to, uh, speak with us, that is your right and you can get a lawyer and then we will be speaking with you and a lawyer, um, and it will be a lawyer that you will get appointed by the court, uh, or it could be a lawyer that you would want to pay for but, that— usually that can make your situation more complicated.[8] And if you pay for a lawyer, that of course costs money. But, if you were to cooperate with us, um, then it's possible that you could—it's possible, again, we are not [Amgen,] you could keep your job. But that all—we would, uh—we want you to provide your information to us, willingly. Uh, you know, either you have to decide whether you have a lawyer or whether or not you want to cooperate with us.

[Xi]: I really don't know.

---

[8]   This is the first time that Agent Winsett makes a reference to the fact that a lawyer will be appointed for Defendant Xi. But as noted infra, Agent Winsett does not do so in the context of Defendant Xi's right to a lawyer if she cannot afford one.

[Creed]: Okay.

[Xi]: I cannot make the decision.

[Winsett]: Okay do—well then the next question is, do you want us to stop asking you questions because remember, earlier, you said that you did not want a lawyer present and you are okay with not having a lawyer present but—

[Xi]: Mm-hmm.

[Winsett]: [But], part way through this conversation you said you wanted to have a lawyer present and we didn't want to continue to ask you questions against, uh, against your will if you—if you do, in fact, have now decided that you want a lawyer. That is our legal obligation to you is to make certain that you have a lawyer present if you want one.

[Xi]: (UI) actually [very easy] to be clarified. I sometimes do send slides to my personal email.

[Winsett]: Okay.

[Xi]: To my husband's email for my [part-time] PhD—

[Winsett]: Okay.

[Xi]: Yeah, project.

[Winsett]: Okay.

[Xi]: So—

(Id. at 19-22.)

Agent Winsett then asked, "Well then, do you—do you want to continue speaking about this without a lawyer present?" (Id. at 22.) Agent Creed added, "T[o] [t]ry and clarify [it]." (Id.) Agent Winsett stated, "To straighten it out." (Id.) Defendant Xi responded, "Mm-hmm. Yeah. I—" (Id.) "Okay," said Agent Creed. (Id.) Agent Winsett clarified, "So you—" (Id.) Defendant Xi confirmed that she wanted to speak, "I—yeah. Yeah. Yes." (Id.) Finally, Agent Winsett stated, "Okay. Okay so then we are clear then—" (Id.)

Defendant Xi then asked whether she would have to go to Los Angeles, to which Agent Winsett stated that she would. (Id. at 22.) Agent Winsett stated that they wanted to make the

14

process as painless, quick, and speedy as possible because they wanted her to be with her daughter that night. (Id.) Agent Winsett stated, "You know, I—we have children and I know what it means to be a parent and—and be in a situation like this. I'm sure it's quite alarming for you." (Id.) She asked whether she could call her friend to pick up her daughter. (Id.) The Agents permitted her to do so, and Defendant Xi placed phone calls to her friend and to her daughter's school. (Id. at 23-25.) The Agents then questioned Defendant Xi for approximately two minutes and described the procedure for pretrial release prior to transporting her to court. (Id. at 26-31; Audio Recording at 39:27-41:16.) The Agents handcuffed Defendant Xi and drove her to downtown Los Angeles. (Doc. No. 186, Ex. A at 36.)

## III.    ANALYSIS

Defendant Xi moves to suppress any statements she made to the FBI Agents after she was taken into custody and invoked her right to counsel. (Doc. No. 160 at 1.) First, she argues that she clearly and unambiguously invoked her right to counsel. (Id. at 3.) Second, she asserts that after invoking such right, she did not then voluntarily, knowingly, or intelligently waive it. (Id. at 5.) The Government concedes that she invoked her right to counsel during her custodial interrogation but argues that despite her invocation, her statements thereafter should not be suppressed because she initiated conversation with the Agents and voluntarily, knowingly, and intelligently waived her right to counsel. [9] (Doc. No. 168 at 10-11.)

---

[9]   At the hearing on the Motion, the Government agreed that Defendant Xi had invoked her right to counsel. (Hr'g Tr. at 113:17-22, Apr. 30, 2018.) The following dialogue occurred:

THE COURT: All right. You're conceding that she did—the way this transcript reads, she did invoke her right to counsel, but you're saying she just voluntarily continued to speak at that point.

MS. DRISCOLL: Correct, and as a result waived her right to counsel and her statements are admissible.

It is undisputed that Defendant Xi was in custody for the purposes of <u>Miranda</u> and the Fifth Amendment when she was arrested and questioned. Because Defendant Xi was not properly read her <u>Miranda</u> rights, the Court will begin the analysis of the admissibility of her statement with a discussion of the <u>Miranda</u> warnings that she was provided. Then, the Court will discuss whether her waiver after invoking her right to counsel was voluntary.

Although Defendant Xi's Motion to Suppress focuses on the invocation of her right to counsel and her assertion that she did not thereafter waive this right, the Court need not focus only on this aspect of her interrogation. Instead, for reasons that follow, the Court finds that Defendant Xi's statement should be suppressed in its entirety because she was not properly advised of her <u>Miranda</u> rights and because after invoking her right to counsel, the Agents coerced her into waiving her rights.

## A. Defendant Xi Was Not Provided Adequate <u>Miranda</u> Warnings Before She Was Interrogated by the Agents

Initially, Defendant Xi's statement must be suppressed because the <u>Miranda</u> warnings she was given were inadequate and misleading. Rather than informing Defendant Xi that counsel would be appointed for her free of charge if she could not afford it, Agent Winsett stated that no one would be appointed to represent her if she could not afford counsel. (Doc. No. 186, Ex. A at 3.) He never corrected this error but instead continued to question Defendant Xi. Agent Winsett later provided further misleading instructions to Defendant Xi when he stated that she could have a lawyer appointed by the court or that she could pay for a lawyer but that "can make [her] situation more complicated." (<u>Id.</u> at 20-21.) But in a constitutional sense, the appointment or hiring of counsel does not "complicate" the situation, a phrase never explained to Defendant Xi by the Agents, for the person questioned, but affords that person the opportunity to exercise the right to counsel.

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In Miranda v. Arizona, the Supreme Court concluded that custodial interrogations contain "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. 436, 467 (1966). Thus, when a suspect is taken into custody, the prosecution must use certain "procedural safeguards effective to secure the privilege against self-incrimination." Id. at 444.

The Supreme Court explained that the procedural safeguards require that a suspect be advised of the following:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Id. at 479. Unless and until a defendant has been given these warnings and the government has shown knowing and intelligent waiver of them, "no evidence obtained as a result of interrogation can be used against him." Id. "Whenever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our Miranda doctrine, the State need prove waiver only by a preponderance of the evidence." Colorado v. Connelly, 479 U.S. 157, 168-69 (1986).

In California v. Prysock, the Supreme Court clarified that the content of Miranda warnings given need not be "a virtual incantation of the precise language contained in the Miranda opinion." 453 U.S. 355, 355 (1981) (per curiam). The Court noted that "Miranda itself indicated that no talismanic incantation was required to satisfy the strictures." Id. at 359. Instead, Miranda warnings "or their equivalent" will suffice. Id. at 360 (emphasis in original) (quoting Rhode Island v. Innis, 446 U.S. 291, 297 (1980)). The words that an agent employs

must reasonably convey to a suspect his rights as required by <u>Miranda</u>. <u>Florida v. Powell</u>, 559 U.S. 50, 60 (2010) (quoting <u>Duckworth v. Eagan</u>, 492 U.S. 195, 203 (1989)).

In <u>Duckworth v. Eagan</u>, after providing defendant with complete <u>Miranda</u> warnings, the police added that they could not provide him with a lawyer but that one would be appointed for him "if and when" he went to court. 492 U.S. at 203. Holding that the warnings satisfied <u>Miranda</u>, the Supreme Court explained that the warnings accurately described the procedure for appointment of counsel in that state. <u>Id.</u> at 203-04. The Court concluded that "<u>Miranda</u> does not require that attorneys be producible on call, but only that the suspect be informed . . . that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one." <u>Id.</u> at 204 (footnote omitted).

Similarly, in <u>United States v. Cruz</u>, the Third Circuit held that adding the statement that defendants could speak without a lawyer present if they wished was not an inaccurate characterization of defendants' rights and did not dilute the substance of the <u>Miranda</u> warnings given. 910 F.2d 1072, 1079 (3d Cir. 1990). The warnings reasonably conveyed to defendant his rights as required by <u>Miranda</u>. <u>Id.</u> (quoting <u>Duckworth</u>, 492 U.S. at 203); <u>see also</u> <u>United States v. Warren</u>, 642 F.3d 182, 185-87 (3d Cir. 2011) (holding that warnings advising defendant of his right to counsel without any reference to whether it commenced or ceased at any particular time "conveyed the substance of the rights expressed in <u>Miranda</u>").

By contrast, in <u>United States v. Wysinger</u>, the Seventh Circuit held that an agent's incorrect <u>Miranda</u> warnings informing defendant that he could speak with an attorney before <u>or</u> after questioning, combined with his tactics used to confuse defendant, made the warnings inadequate and misleading and the interrogation inadmissible. 683 F.3d 784, 803 (7th Cir. 2012).

Defendant was arrested and interrogated by a police officer and a DEA agent.  Id. at 789.  After the officer and the agent entered the interrogation room, defendant asked whether he needed a lawyer.  Id. at 797.  The agent stated, "Well, we're going to talk about that," sidestepping the question.  Id. at 789.  The agent introduced himself, told defendant he was under arrest, and began to read him his rights from a card.  Id.  The agent stated, "You have a right to talk to a lawyer for advice before we ask any questions <u>or</u> have one—have an attorney with you during questioning.  If you can't afford a lawyer, one will be appointed for you before we ask any questions.  Do you understand . . ."  Id. at 797 (emphasis added).  At this point, the agent slapped the table loudly, stating that he had felt something crawling on his neck.  Id.  Then, in response to the agent's questions, defendant stated that he had been arrested before, that he did not have a high school or college education, but that he understood his rights.  Id.  Ultimately, defendant made incriminating statements, which he moved to suppress, arguing in part that he was provided inadequate and misleading Miranda warnings.  Id. at 791-92, 796.

The Seventh Circuit agreed, holding that the agent misstated the Miranda warnings when he told defendant that he could speak with an attorney before <u>or</u> during questioning rather than both before <u>and</u> during questioning.  Id. at 798.  The court reasoned that "[t]he agent's divergence from the familiar script would put a suspect to a false choice between talking to a lawyer before questioning or having a lawyer present during questioning, when Miranda clearly requires that a suspect be advised that he has the right to an attorney both before and during questioning."  Id. at 799.  The court concluded:

> Although there is no particular language that must be used to convey the warnings, and although we are not to construe the words of the warning as if reading the terms of a will or an easement, the difference between an "and" and an "or," depending on the context, may cause a serious misunderstanding of one of the core Miranda rights.

Id. at 800 (citation omitted). The agent did not correct the error but went on to imply that questioning had not yet begun and told defendant that the only choices he had were to cooperate or be charged with a conspiracy. Id. at 803. Thus, the incorrect warnings paired with the agent's tactics to confuse the defendant rendered the warning inadequate and misleading and therefore the entire interrogation was inadmissible. Id.

Likewise, in United States v. San Juan-Cruz, the Ninth Circuit held that where defendant was given two sets of conflicting warnings, the substance, content, and clarity of the Miranda warnings were not conveyed to him, and his statements should have been suppressed. 314 F.3d 384, 397-89 (9th Cir. 2002). After being taken into custody at the California border while attempting to re-enter the United States illegally after deportation, defendant was read his administrative rights, which included that he had the right to have counsel present during questioning but not at the government's expense. Id. at 386. Soon after, he was properly read his Miranda rights, which included the advice that if he could not afford an attorney, one would be appointed for him. Id. at 386-87. Defendant moved to suppress his statement. Id. at 387.

The court explained that Miranda requires "meaningful advice to the unlettered and unlearned in language which [they] can comprehend and on which [they] can knowingly act." Id. at 387 (alterations in original) (quoting United States v. Connell, 869 F.2d 1349, 1351 (9th Cir. 1989)). The court stressed that for a warning to be valid, "the combination or the wording of its warnings cannot be misleading" and it "must be clear and not susceptible to equivocation." Id. (quoting Connell, 869 F.2d at 1352). "The warning also must make clear that if the arrested party would like to retain an attorney but cannot afford one, the Government is obligated to appoint an attorney for free." Id. at 388 (citing Connell, 869 F.2d at 1353). Defendant "could not reasonably ascertain from the warnings provided to him by the Government whether he could

or could not retain the services of an attorney for free." Id.  The court suppressed the statement, concluding that although the agent could have clarified his statements, he did not, and the Miranda warnings were not clearly conveyed.  Id.  at 389.

Courts have consistently held that Miranda warnings are inaccurate and insufficient where the defendant is not informed that an attorney will be appointed for her if she cannot afford one.  See, e.g., United States v. Botello-Rosales, 728 F.3d 865, 867-68 (9th Cir. 2013) (per curiam) (reversing denial of motion to suppress because Spanish Miranda warnings which used the incorrect Spanish word for "free" did not "reasonably convey" the government's obligation to appoint an attorney for an indigent suspect); United States v. Street, 472 F.3d 1298, 1311-12 (11th Cir. 2006) (holding that Miranda warnings were not sufficient where the agent omitted advice that anything defendant said could be used against him in court and that an attorney would be appointed for him if he could not afford one); United States v. Perez-Lopez, 348 F.3d 839, 848-49 (9th Cir. 2003) (reversing denial of motion to suppress where Spanish Miranda warnings incorrectly and misleadingly informed defendant that he must "solicit" the court for an attorney if he could not afford one rather than that the government was obligated to provide him one); United States v. Gooch, 915 F. Supp. 2d 690, 723 (W.D. Pa. 2012) (holding that statement would be suppressed where Miranda warnings omitted any reference to defendant's right to have an attorney appointed for her prior to any questioning in the event that she could not afford one).

In the instant case, Agent Winsett informed Defendant of her Miranda rights after she was arrested and handcuffed.  (Doc. No. 186, Ex. A at 3.)  He informed her that she had the right to remain silent, that she had the right to talk to a lawyer for advice before they asked her any questions, and that she had the right to have a lawyer with her during questioning.  (Id.)  But rather than informing Defendant Xi that an attorney would be appointed for her if she could not

afford one, Agent Winsett stated, "If you cannot afford a lawyer, <u>no one</u> will be appointed for you before any questioning, if you wish." (<u>Id.</u> (emphasis added).)

By incorrectly informing Defendant Xi that no one would be appointed if she could not afford an attorney, the warnings did not reasonably convey to Defendant Xi her rights as required by <u>Miranda</u>. <u>See</u> <u>Powell</u>, 559 U.S. at 60. The error in the <u>Miranda</u> warnings was "not one of form or phrasing, but of substance." <u>See</u> <u>Street</u>, 472 F.3d at 1312. Unlike in <u>Duckworth</u>, 492 U.S. at 204, where the <u>Miranda</u> warnings informed defendant that an attorney would be provided if he could not afford one if and when he went to court, here, the <u>Miranda</u> warnings given were the exact opposite of what they should have been. Instead of informing Defendant Xi that she would be appointed an attorney if she could not afford one, Agent Winsett told her that "no one" would be appointed for her. And unlike in <u>Cruz</u>, 910 F.3d at 1079, where the substance of the <u>Miranda</u> warnings was not diluted by the added statement that defendants could speak without a lawyer present if they wished, in this case, the substance of the <u>Miranda</u> warnings was inaccurate because Defendant Xi was told that no one would be appointed to represent her if she could not afford to pay.

Just as the <u>Miranda</u> warnings in <u>Wysinger</u>, 683 F.3d at 803, which incorrectly informed defendant that he could speak with an attorney before <u>or</u> after questioning, rendered the entire interrogation inadmissible, so too do the incorrect <u>Miranda</u> warnings in this case. Like the agent in <u>Wysinger</u>, Agent Winsett did not correct his error but went on to question Defendant Xi, and his later statements wove confusion into the already incorrect <u>Miranda</u> warnings he had given. The warnings became further misleading when Agent Winsett stated:

> If you choose not to, uh, speak with us, that is your right and you can get a lawyer and then we will be speaking with you and a lawyer, um, and <u>it will be a lawyer that you will get appointed by the court, uh, or it could be a lawyer that you would want to pay for but, that—usually that can make your situation more complicated.</u>

And if you pay for a lawyer, that of course costs money. But, if you were to cooperate with us, um, then it's possible that you could—it's possible, again, we are not [Amgen,] you could keep your job.

(Doc. No. 186, Ex. A at 20-21 (emphasis added).) Not only was Defendant Xi never clearly informed that an attorney would be appointed for her at no expense to her if she could not afford one, but Agent Winsett's statement further misled her about the effect of obtaining counsel by stating that "can make your situation more complicated."[10] (Id. at 21.) This ambiguous iteration of a constitutional right by a government agent could be interpreted by a layperson as an indication that she would be adversely affected by invoking her right to counsel, an interpretation that Miranda was not meant to convey. Such a qualifier dilutes the warnings that you have the right to talk to a lawyer for advice before and during questioning and that if you cannot afford a lawyer, one will be appointed for you before any questioning. It even dilutes the right to counsel itself.

Finally, although the Advice of Rights Form with which Defendant Xi was provided contained the correct Miranda warnings, the font size on the form was very small (it appears to be six to eight point type), is difficult to read, and was written in English—Defendant Xi's second language.[11] The portion of the form concerning a suspect's waiver of rights is titled "Consent." The form states that it was revised on November 5, 2002. The form is attached as Exhibit A.

---

[10] The obtaining of counsel may complicate the Government's ability to obtain evidence in a criminal case or the timing to secure such evidence, but one overriding objective of Miranda was to ensure that people have the advice of counsel, if that is their desire, during a custodial moment unfamiliar to the average person when an interview has the potential to jeopardize their liberty.

[11] Agent Winsett's misreading of the form by inserting the word "no" before the word "one" may have been caused by a reading of such small type. Even if the error was inadvertent, the warning was still misleading.

The Advice of Rights Form that Defendant Xi was given contrasts dramatically with the form that her co-Defendant, Tian Xue, was given. The Advice of Rights Form given to Tian Xue is attached as Exhibit B. The form given to Tian Xue is written in what appears to be an eleven or twelve point font, and the portion of the form concerning a suspect's waiver of rights is titled "Waiver of Rights" rather than "Consent." This form states that it was revised February 28, 1997. Thus, it appears from a comparison of the two forms that the FBI revised its Advice of Rights Form in 2002 to make the font size smaller and to re-label the waiver portion as "Consent."[12]

---

[12] The Court is concerned with the format of the Advice of Rights Form that Defendant Xi was apparently provided because of the small font size in which it is printed. This Court has not found any reported decision from the United States Supreme Court or from the Third Circuit addressing the effect of an Advice of Rights Form printed in a small font size. Courts that have discussed the size of the print on a Miranda waiver form have included font size as a factor in determining whether the defendant's waiver of rights was knowing and intelligent. See People v. Parish, No. 321329, 2015 WL 3649082, at *2 (Mich. Ct. App. June 11, 2015) (holding that Miranda waiver was knowing and intelligent where, contrary to appellant's arguments, the waiver form was "perfectly legible, had bold, capitalized subheadings and beneath each of these headings the form contained sufficient detail to apprise defendant of the rights implicated and the consequences of waiving those rights"); State v. Griffin, No. CA98-05-100, 1999 WL 270321, at *4 (Ohio Ct. App. May 3, 1999) (finding that appellant was properly provided Miranda warnings where, contrary to his argument, the contested paragraph on the waiver form was "more than conspicuous, being an indented, bold-typed paragraph in the middle of the form" and he read and signed the form).

To some extent guidance also can be found in an unrelated federal statute, the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq. The Third Circuit has held that under the FDCPA a validation notice in a debt collection letter, which describes rights a debtor possesses, "must be in print sufficiently large to be read, and must be sufficiently prominent." Caprio v. Healthcare Revenue Recovery Grp., LLC, 709 F.3d 142, 148 (3d Cir. 2013) (quoting Graziano v. Harrison, 950 F.2d 107, 111 (3d Cir. 1991)). To comply with the FDCPA, 15 U.S.C. § 1692g, notice must be "conveyed effectively to the debtor." Wilson v. Quadramed Corp., 225 F.3d 350, 354 (3d Cir. 2000) (citation omitted). A custodial interrogation also raises a compelling need for rights to be effectively conveyed in large, readable type, especially since the person being interviewed is asked to read the form in a stressful setting.

In any event, Defendant Xi was given two sets of conflicting warnings.  See Connell, 869 F.2d at 1353 (holding that warnings fell below minimum required standards where defendant was given inaccurate oral warnings with accurate written warnings).  She was not given "meaningful advice to the unlettered and unlearned in language which [she] can comprehend and on which [she] can knowingly act."  San Juan-Cruz, 314 F.3d at 387.  Because the warnings did not reasonably convey to Defendant Xi her rights as required by Miranda, her statement will be suppressed.

### B.     Defendant Xi Did Not Voluntarily Waive Her Miranda Rights After Invoking Her Right to Counsel

Because Defendant Xi was not given accurate Miranda warnings, for this reason her statement will be suppressed in its entirety.  But Defendant Xi's statement made after invoking her right to counsel also will be suppressed on another ground: her alleged waiver thereafter was not voluntary but was the product of deception.  Undoubtedly, she invoked her right to counsel when she twice stated, "I think I need a lawyer" (Doc. No. 186, Ex. A at 17, 18) and "Uh, yea" (Id. at 18) when asked again if she wanted counsel, a point that the Government concedes.  But any potential waiver thereafter was the product of deception.

After a defendant unequivocally invokes her Miranda right to counsel, agents can only question her if she initiates conversation with the agents.  United States v. Velasquez, 885 F.2d 1076, 1084 (3d Cir. 1989) (quoting Edwards v. Arizona, 451 U.S. 477, 484-85 (1981)).  The presence of two factors is required.  Id.  First, the defendant "must initiate the conversation with the authorities."  Id. (citing Oregon v. Bradshaw, 462 U.S. 1039, 1045-46 (1983) (plurality opinion)).  An initiation occurs when the defendant "initiates a conversation 'evinc[ing] a willingness and a desire for a generalized discussion about the investigation.'"  Id. at 1085 (alteration in original) (quoting Bradshaw, 462 U.S. at 1046).  The initiation must be more than

"merely a necessary inquiry arising out of the incidents of the custodial relationship." Id. (quoting Bradshaw, 462 U.S. at 1046). The initiation requirement is "a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers." Id. (quoting Bradshaw, 462 U.S. at 1044).

Second, after the defendant initiates conversation, "the waiver of the right to counsel and the right to silence must be knowing and voluntary." Id. at 1084 (citing Bradshaw, 46 U.S. at 1045-46). A proper waiver occurs when it is "made voluntarily, knowingly and intelligently" under "the totality of the circumstances." Id. at 1086 (quoting Bradshaw, 462 U.S. at 1046). The "totality of the circumstances" includes "the facts of the particular case, including the background, experience, and conduct of the suspect." Id. (quoting Bradshaw, 462 U.S. at 1046). The inquiry is twofold. Id. at 1084. As the Third Circuit explained in United States v. Velasquez:

> First, the waiver must have been voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." Moran v. Burbine, 475 U.S. 412, 421, 106 S. Ct. 1135, 1141, 89 L. Ed. 2d 410 (1986) (citing Fare v. Michael C., 442 U.S. 707, 725, 99 S. Ct. 2560, 2572, 61 L. Ed. 2d 197 (1979)). Second, the waiver "must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." Id.

Id.

As noted, the Government does not dispute that Defendant properly invoked her right to counsel during her custodial interrogation. (Doc. No. 168 at 10-11.) Thus, under the above framework, the Court will examine whether Defendant Xi initiated conversation after invoking her right to counsel and whether her waiver thereafter was voluntary, knowing, and intelligent.

1.    **Defendant Xi's Alleged Initiation of Conversation**
      **After Invoking Her Right to Counsel**

Defendant Xi argues that after invoking her right to counsel, she did not thereafter reinitiate conversation with the Agents. (Doc. No. 160 at 5.) The Government argues that she did initiate conversation with the Agents. (Doc. No. 168 at 10-11.)

After a defendant unambiguously invokes her <u>Miranda</u> right to counsel, all interrogation must cease. <u>Smith v. Illinois</u>, 469 U.S. 91, 98 (1984) (per curiam). Interrogation includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300 (1980) (footnotes omitted). Indeed, "[t]he law in this area is clear: once an accused requests counsel, the officer cannot ask questions, discuss the case, or present the accused with possible sentences and the benefits of cooperation." <u>United States v. Gomez</u>, 927 F.2d 1530, 1539 (11th Cir. 1991) (citations omitted).

In <u>Oregon v. Bradshaw</u>, the Supreme Court held that the question, "Well, what is going to happen to me now?" was an initiation of further conversation. 462 U.S. at 1045; <u>see also</u> <u>Velasquez</u>, 885 F.2d at 1085 (holding that question, "What is going to happen?" was an initiation of conversation because, in context, it was directed toward the investigation). The Court clarified, however, that "there are undoubtedly situations where a bare inquiry by either a defendant or by a police officer should not be held to 'initiate' any conversation or dialogue." <u>Bradshaw</u>, 462 U.S. at 1045. For example, some inquiries, "such as a request for a drink of water or a request to use the telephone . . . are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." <u>Id.</u>; <u>see also</u> <u>Velasquez</u>, 885 F.2d at 1085 (offering as

an example a request to use the bathroom as a routine statement incidental to the custodial relationship, which does not fulfill the first part of Bradshaw's plurality test).

Only if the defendant "after requesting counsel, voluntarily initiates further communication can the agents pursue more information and interrogation." Gomez, 927 F.3d at 1539 (citing Edwards, 451 U.S. at 484-85). Notably, "[a]lthough Edwards permits further interrogation if the accused initiates the conversation, . . . the validity of this waiver logically depends on the accused being free from further interrogation." Id. at 1538-39. That is, "the 'initiation' must come prior to further interrogation; initiation only becomes an issue if the agents follow Edwards and cease interrogation upon a request for counsel." Id. at 1539.

In this case, after Defendant Xi invoked her right to counsel twice during the interview, Agent Winsett did not immediately cease questioning her but again sought to clarify whether she wanted a lawyer, stating, "Okay. Then we will stop the questioning now. So you—we just want to be certain then, uh, uh, you want to have a lawyer present then, correct?" (Doc. No. 186, Ex. A at 18.) Defendant Xi confirmed, "Uh, yea. I don't have a lawyer and don't know how to handle this." (Id.) Rather than ceasing to question Defendant Xi at this point, Agent Creed then informed her that a lawyer would be provided to her when she arrived in downtown Los Angeles, thus keeping the conversation going. (Id.) The incriminating documents and Power Points with which the Agents had confronted Defendant Xi were still lying on the table in front of her, and all three Agents were still present in the room.

Next, Defendant Xi asked whether she could call her friend to make arrangements for her daughter and also whether she could call co-Defendant Yu Xue. (Id.) Agent Winsett explained that she could only speak with her friend to arrange for her daughter to be picked up but that she could not speak with anyone else. (Id.) Defendant Xi then asked, "How long all this take? Will

I be, like, [longer than one day then] do I need to call my relatives?"  (Id.)  Agent Winsett explained that she would appear before a judge that day and described the process that would follow.  (Id. at 18-19.)  The incriminating documents still lay on the table in front of Defendant Xi.   Until this point, any statements that Defendant Xi made were not an initiation of conversation but were "necessary inquir[ies] arising out of the incidents of the custodial relationship."  Velasquez, 885 F.2d at 1085 (quoting Bradshaw, 462 U.S. at 1046).  They related to arrangements for her daughter and did not demonstrate a willingness to discuss the investigation.

Defendant Xi then asked, "Um, so all I did was this wrong, right?  Those didn't have nothing to do with me."  (Doc. No. 186, Ex. A at 19.)  She also stated, "That's not my email." (Id.)  A rustling of papers can be heard on the audio recording as Defendant Xi referenced incriminating documents.  (See Audio Recording at 24:04-05.)  That the Agents did not remove the incriminating documents causes the Court to question whether this was a tactic designed to lull Defendant Xi into voluntarily initiating conversation.   The Court need not determine, however, whether Defendant Xi initiated the conversation because for reasons that follow, the Court finds that she did not voluntarily waive her Miranda rights thereafter.

### 2.      Defendant Xi's Waiver Was Not Voluntary

Defendant Xi submits that her waiver was not voluntary because it was the product of misleading statements about the complications of obtaining counsel, coercive statements about the possibility of keeping her job at Amgen and having her charges dropped or reduced in exchange for cooperation, and the Agents' badgering her for clarification regarding whether she wanted counsel.  (Doc. No. 160 at 6.)  In addition, as noted above, the Miranda rights were not properly explained to her regarding appointment of counsel.  The Government responds that Defendant Xi's waiver was voluntary because most of her interactions with the Agents after

invoking her right to counsel consisted of "proactive initiation of conversation," the Agents informed her of her rights eight times, and none of the Agents' statements about cooperation coerced her into waiving her right to counsel.  (Doc. No. 168 at 14-15.)  But based on the totality of the circumstances, Defendant Xi's waiver was not voluntary.

As noted, after a defendant initiates conversation, her waiver thereafter must be "voluntary, knowing, and intelligent" under "the totality of the circumstances."  Velasquez, 885 F.2d at 1086 (quoting Bradshaw, 462 U.S. at 1046).  The waiver must be "voluntary 'in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'"  Id. at 1084 (quoting Moran, 475 U.S. at 421).  "A necessary predicate to a finding of involuntariness is coercive police activity" and "some causal connection between the police conduct and the confession."  United States v. Jacobs, 431 F.3d 99, 108 (3d Cir. 2005) (citing Colorado v. Connelly, 479 U.S. 157, 164, 167 (1986)).  Even if a defendant initiates the conversation that takes place after she has invoked her right to counsel, "where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation."  Bradshaw, 462 U.S. at 1044.  Against this backdrop, the Court will discuss each of the Agents' actions that caused her waiver to be involuntary under the totality of the circumstances.

### i.   Ambiguous and Deceptive Statements Regarding Appointment of Counsel and the Complications of Obtaining Counsel

As noted above, the Miranda warnings that Agent Winsett read to Defendant Xi were inaccurate because they informed her that if she could not afford an attorney, no one would be provided for her.  Agent Winsett never corrected the warnings but instead further confused the instructions by stating that Defendant Xi could get a lawyer appointed by the Court or could get

a lawyer that she would pay for but that it would "make [her] situation more complicated."

(Doc. No. 186, Ex. A at 21.)  Agent Winsett stated:

> If you choose not to, uh, speak with us, that is your right and you can get a lawyer and then we will be speaking with you and a lawyer, um, and <u>it will be a lawyer that you will get appointed by the court, uh, or it could be a lawyer that you would want to pay for but, that—usually that can make your situation more complicated. And if you pay for a lawyer, that of course costs money.</u>

(<u>Id.</u> (emphasis added).)

Agent Winsett's statement that Defendant Xi could hire a lawyer but that it would cost money and that obtaining counsel would complicate the situation was both coercive and deceptive.  <u>See</u> <u>Hart v. Attorney General</u>, 323 F.3d 884, 894-95 (11th Cir. 2003) (telling defendant "honesty wouldn't hurt him" contradicted <u>Miranda</u> warning that anything he said could be used against him in court rendering his waiver not voluntary, knowing, and intelligent). Both the inaccurate <u>Miranda</u> warnings and subsequent deceptive and coercive statement about the complications of obtaining counsel contributed to the involuntariness of Defendant Xi's waiver.

### ii. Misleading Statements About Keeping Her Job at Amgen and Having Her Charges Dropped or Reduced in Exchange for Cooperation

After Defendant Xi invoked her right to counsel, the Agents made misleading and deceptive statements about the possibility of keeping her job at Amgen and having her charges dropped or reduced in exchange for cooperation.  These statements contributed to the deception that produced her involuntary waiver.

Here, after Defendant Xi invoked her right to counsel, she continued to deny that she had done anything wrong while referring to apparently incriminating documents that still lay in front of her.  (Doc. No. 186, Ex. A at 19.)  After some back and forth, Agent Winsett stated, "Now, Lucy, I believe it's possible that, you know, somehow you were tricked or—maybe you

misunderstood, you know . . . That's what we're trying to sort out."  (Id. at 19-20.)  The Agents continued to ask her for clarification as to whether she wanted counsel, and she again expressed that she needed her job.  (Id. at 20.)

Agent Winsett then stated that when people are arrested by the FBI, "if they are willing and able to cooperate," it generally helps their situation.  (Id.)  He continued, "if you are able to cooperate with us we can then provide your information to the prosecutor and the Judge and that will help determine, you know, whether the charges are dropped or whether they are reduced, or whatever."  (Id.)  He stated, "Um, we cannot promise that any of that will happen but, in most cases, or in some cases, um, if cooperation is provided, uh, then it generally will make your situation better."  (Id.)  He also added, "[b]ut, if you were to cooperate with us, um, then it's possible that you could—it's possible, again, we are not [Amgen] you could keep your job." (Id.)

These statements by the Agents were coercive and, to some extent, deceptive.  First, a judge does not determine initially if charges are dropped or reduced.  This is a function of the prosecutor.  Telling a person that "generally" cooperation will make their situation better is incomplete and ambiguous and meant to entice the person into cooperating.  In addition, although Agent Winsett stated that he cannot make any promises, he modified the statement by saying "in most cases, or in some cases, um, if cooperation is provided, uh, then it generally will make your situation better."  (Id.)  Further, he had no information about whether Defendant Xi could keep her job at Amgen if she cooperated with the Agents.  The totality of this exchange undoubtedly is coercive and, to some extent, deceptive.

### iii.    Repeated Requests for Clarification

Finally, the Agents' repeated requests for clarification on whether she wanted counsel amounted to badgering her into waiving her rights.  After Defendant Xi continued to equivocate,

the Agents repeatedly asked her to clarify whether she wanted counsel. (Doc. No. 186, Ex. A at 22.) Agents Winsett and Creed went back and forth repeating that Defendant Xi had to make it clear to them whether she wanted to speak with them to "straighten it out." (Id.) Only after these exchanges did Defendant Xi agree to speak again.

In total, from the time that she first stated, "I think I need a lawyer," she was asked eight times to clarify whether she wanted counsel. (Id. at 18-22.) This consistent back and forth of the Agents' pressing her to clarify whether she wanted counsel amounted to "badgering" her into waiving her previously invoked right to counsel. Minnick v. Mississippi, 498 U.S. 146, 150 (1990) (quoting Michigan v. Harvey, 494 U.S. 344, 350 (1990)); see also Smith v. Illinois, 469 U.S. 91, 97 (1984) (per curiam) (instructing that if questioning does not cease after the accused requests counsel, "the authorities through 'badger[ing]' or 'overreaching'—explicit or subtle, deliberate or intentional—might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance." (alteration in original) (citations omitted)).

Although the Government argues that the clarification was prompted by her initiation of conversation with the Agents, it is apparent that the Agents understood that she had invoked her right to counsel at least twice and that her further statements were the product of the custodial situation in which she found herself and the enticement of the Agents in telling her that it is possible she was tricked, that obtaining counsel would complicate her situation, that cooperation may somehow help her, and that she would keep her job. Based on the totality of the circumstances, the Agents' deceptive and coercive conduct rendered Defendant Xi's waiver of her previously invoked right to counsel not voluntary. Accordingly, Defendant Xi's statement after invoking her right to counsel will be suppressed.

## IV.    CONCLUSION

For the foregoing reasons, Defendant Xi's Motion to Suppress (Doc. No. 160) will be granted.  An appropriate Order follows.

# Exhibit A

FEDERAL BUREAU OF INVESTIGATION
# ADVICE OF RIGHTS

## LOCATION

Place:
**Thousand Oaks, CA**

Date:
**1/5/2016**

Time:

## YOUR RIGHTS

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

## CONSENT

I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer
questions without a lawyer present.

Signed: _____

## WITNESS

Witness: _____

Witness: _____

Time: _____

# Exhibit B

FD-395 (Rev 2-28-97)

# ADVICE OF RIGHTS

Place __FBI Charlotte__
Date __1/5/2016__
Time __9:29 am__

## YOUR RIGHTS

Before we ask you any questions, you must understand your rights.

X̶ You have the right to remain silent.

X̶ Anything you say can be used against you in court.

X̶ You have the right to talk to a lawyer for advice before we ask you any questions.

X̶ You have the right to have a lawyer with you during questioning.

X̶ If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

X̶ If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

## WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

Signed _____

Witness: _____

Witness: ____ Kathryn L. Swinker

Time: __9:29 AM__