IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

LUCY XI,

                    Defendant.

CRIMINAL ACTION
NO. 16-22-5

## OPINION

Slomsky, J.                                                September 1, 2021

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................ 1

II.    BACKGROUND ............................................................................................... 2

III.   DISCUSSION ................................................................................................... 7

       A.   The Government's Motion in Limine to Exclude Evidence
            of Civil Complaint and its Allegations ................................................. 7

       B.   Defendant Lucy Xi's Pretrial Motions .................................................. 13

            1.   Motions in Limine ........................................................................ 13

                 a.   Motion to Admit FBI Special Agent Winsett's Admissions
                      Regarding Defendant ............................................................ 13

                 b.   Motion to Admit Judicial Admissions .................................. 20

                 c.   Motion to Exclude October 11, 2013 E-mail from Defendant Xi
                      to Co-Defendant Yan Mei ..................................................... 23

                 d.   Motion to Prevent the Government from Relitigating
                      Conclusions of Law Made by This Court .............................. 28

            2.   Motion to Suppress Confidential Marital Communications ....................... 31

**a.**   July 31, 2012 Electronic Chat ...................................................... **34**

**b.**   August 28, 2012 Electronic Chat .............................................. **38**

**c.**   September 4, 2012 Electronic Chat ........................................... **40**

**d.**   October 11, 2013 Email ............................................................ **42**

**IV.**   **CONCLUSION** ..................................................................................... **46**

## I.    INTRODUCTION

On May 24, 2017, a forty-five count Superseding Indictment was returned against Defendant Lucy Xi and four co-Defendants—Yu Xue, Tao Li, Yan Mei, and Tian Xue.  (Doc. No. 125.)  Defendant Lucy Xi is charged with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count 1); conspiracy to steal trade secrets, in violation of 18 U.S.C. § 1832(a)(5) (Count 2); wire fraud, in violation of 18 U.S.C. § 1343 (Counts 4-19); and theft of trade secrets, in violation of 18 U.S.C. § 1832(a) (Counts 23-25).  (See id.)  The charges stem from an alleged conspiracy to steal confidential and trade secret information from GlaxoSmithKline, LLC ("GSK") for use by another corporation, Renopharma, Ltd., created in China.

Before the Court are a number of pretrial motions pertaining to Defendant Lucy Xi that are ripe for disposition: (1) the Government's Motion in Limine to Exclude Evidence of Civil Complaint and its Allegations (Doc. No. 210), and the following Motions filed by Defendant Xi: (2) Motion in Limine #1: for Admission of Federal Bureau of Investigation ("FBI") Special Agent Winsett's Admissions Regarding Ms. Xi (Doc. No. 214); (3) Motion in Limine #2: for Admission of Judicial Admissions (Doc. No. 216); (4) Motion in Limine #3: to Exclude October 11, 2013 E-mail from Lucy Xi to Yan Mei (Doc. No. 217); (5) Motion to Suppress Confidential Marital Communications (Doc. No. 260); and (7) Motion in Limine #5: to Prevent the Government from Relitigating Conclusions of Law Made by this Court (Doc. No. 374).

For the reasons discussed infra, the Government's Motion in Limine (Doc. No. 210) will be granted, and Defendant Lucy Xi's Motions (Doc. Nos. 214, 217, 260, 374) will be denied, except for her Motion in Limine for Admission of Judicial Admissions (Doc. No. 216), which will be denied without prejudice.

## II.   BACKGROUND

This Court previously summarized the facts of Defendant Xi's case as follows:

From July 14, 2008 to November 3, 2015, Defendant Lucy Xi was employed as a scientist at GSK.  (Doc. No. 125 at 7 ¶ 16.)  In 2015, she moved to Thousand Oaks, California to work for Amgen, a biotechnology company.  (See Doc. No. 186, Ex. A.)  On December 29, 2015, the Government filed a Criminal Complaint against Defendants Yu Xue, Tao Li, Yan Mei, Tian Xue, and Lucy Xi charging them with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.  (Doc. No. 1.)  That same day, warrants for the arrest of Lucy Xi and the other four Defendants were issued by a United States Magistrate Judge.  On January 5, 2016, FBI Special Agents David Winsett, Lisa Grover, and Jeremy Creed arrested Defendant Xi at Amgen and subsequently interviewed her.  (Doc. No. 186, Ex. A.)

. . . .

On May 24, 2017, a forty-five count Superseding Indictment was returned against the five Defendants, including Defendant Xi, which added allegations and two additional counts of theft of trade secrets.  (Doc. No. 125.)  The Superseding Indictment alleges that from 2010 to 2016, Defendants conspired to steal confidential and trade secret information from GSK and misappropriated thirty-six GSK documents containing confidential or trade secret information.  (Id. ¶¶ 25-60.)  It alleges that Defendants did so for the benefit of Renopharma, a company created in China to market, sell, and profit from the stolen GSK trade secret and confidential information.  (Id. ¶¶ 64.)  Defendant Xi is charged in the Superseding Indictment with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 (Count 1); conspiracy to steal trade secrets in violation of 18 U.S.C. § 1832(a)(5) (Count 2); wire fraud in violation of 18 U.S.C. § 1343 (Counts 4-19); and theft of trade secrets in violation of 18 U.S.C. § 1832(a) (Counts 23-25).

The Superseding Indictment alleges that from July 14, 2008 to November 3, 2015, Defendant Xi worked as a scientist at GSK.  (Id. ¶ 16.)  As an employee of GSK, Defendant Xi signed a Conditions of Employment Agreement by which she agreed to abide by the Code of Conduct.  (Id. ¶¶ 11, 16.)  In doing so, she agreed not to engage in any competition with GSK, to avoid conflicts of interest, and not to use any confidential GSK information for her own benefit or for the benefit of other companies.  (Id.)  While at GSK, Defendant Xi "e-mailed trade secret and otherwise confidential information" to her then-husband, co-Defendant Yan Mei, to assist his work at Renopharma.  (Id. ¶¶ 16, 61, 63.)  Defendant Xi "did not have permission to transfer the trade secret or otherwise confidential information outside of GSK."  (Id. ¶ 16.)

The Superseding Indictment also alleges that Defendant Xi and co-Defendants Yu Xue, Tao Li, and Yan Mei created a U.S. corporation called Humanabio, Inc. as a U.S. subsidiary of Renopharma to hide their association with the Renopharma

entities and to otherwise facilitate Renopharma's objective of marketing, selling, and profiting from the stolen GSK information.  (Id. at 26 ¶ 65.)

As overt acts in furtherance of the conspiracy, the Superseding Indictment alleges that on February 13, 2012, Yu Xue sent Defendant Xi an email with an attached GSK Power Point presentation titled, "Potent Antibody Drugs by Design," containing confidential GSK information.  (Id. at 28 ¶ 7.)  That same day, Defendant Xi forwarded this email with the attachment to Yan Mei.  (Id. ¶ 8.)  Then, on March 21, 2012, Yan Mei sent an email to Defendant Xi with a business plan for a new company attached.  (Id. ¶ 9.)  Next, on April 1, 2012, Yu Xue sent an email from her personal email account to co-Defendant Tian Xue that contained a business plan for a new company as an attachment, similar to the business plan that Yan Mei sent to Defendant Xi on March 21, 2012.  (Id. ¶ 10.)  That same day, Yu Xue sent an email from her personal email account to Yan Mei that contained the same or similar business plan for a new company as an attachment that she had sent to Tian Xue earlier in the day.  (Id. ¶ 11.)

The Superseding Indictment states that on July 16, 2012, Yu Xue caused Renopharma, Inc. to be incorporated in Delaware.  (Id. at 30 ¶ 19.)  Then, on July 31, 2012, Yan Mei exchanged messages with Defendant Xi about Yu Xue's future plans.  (Id. ¶ 20.)  Defendant Xi told Yan Mei that Yu Xue intended to quit her job at GSK in one or two years and explained that Yu Xue wanted to "get the money first."  (Id.)  Yan Mei replied, "that is our plan."  (Id.)  Later that same day, Yan Mei exchanged additional messages with Defendant Xi, explaining to her that he had almost completed the "R&D plan" and the "CRO plan" for Renopharma.  (Id. ¶ 21.)  Defendant Xi suggested that Yan Mei "check some books of negotiation and leadership" to build up his skill set for his job at Renopharma.  (Id.)

The Superseding Indictment further alleges that on August 28, 2012, Yan Mei exchanged messages with Defendant Xi about Yu Xue.  (Id. ¶ 22.)  Defendant Xi complained to Yan Mei that Yu Xue had been "annoying" her recently, and Yan Mei counseled her, "don't lose [your] temper" with Yu Xue.  (Id. (alteration in original).)  Defendant Xi responded, "I won't . . . she is the queen."  (Id. (omission in original).)  At the end of the conversation, Defendant Xi said, "Yu [YU XUE] showed me an email she drafted" and, discussing the terms of a Renopharma deal, suggested, "I think you should take out the 10% to 25% out.  It is too much.  lets just use 30% as the starting point."  (Id. at 31 ¶ 22 (alteration in original).)

Then, on September 4, 2012, Defendant Xi exchanged messages with Yan Mei about his work at Renopharma.  (Id. at 32 ¶ 27.)  She told him, "You need to practice before you present," and "I told Yu [YU XUE] that you did not send [a] copy [of the presentation] to her because Tao [TAO LI] wants to combine yours with his and then Tao [TAO LI] will send it to Yu [YU XUE]."  (Id. (alterations in original).)  She then stated, "Be careful in the future.  Dont disappoint me anymore.  it is really stupid the way you handle stuff."  (Id.)

3

On January 1, 2013, Defendant Xi sent an email to Yan Mei the subject line of which read "a good paper to read." (Id. at 34 ¶ 32.) In the email, she wrote to Yan Mei, "You need to understand it very well.  It will help you in your future business [RENOPHARMA]."[1]  (Id. (alteration in original).) . . . . Finally, the Superseding Indictment alleges that on October 11, 2013, Defendant Xi sent Yan Mei an email warning him about two scientists working at Eli Lilly who had been indicted for stealing trade secret information.  (Id. at 36 ¶ 41.)

United States v. Xi, No. 16-22-5, 2018 WL 3648178, at *3-4 (E.D. Pa. Aug. 1, 2018) (alterations in original) (footnote omitted).

On March 5, 2018, Defendant Xi filed a Motion to Suppress statements she made to the FBI Agents who arrested her (Doc. No. 160), and a Motion to Dismiss for Prosecutorial Misconduct or, in the Alternative, Motion to Sever (Doc. No. 159).  On July 6, 2018 and August 1, 2018, respectively, this Court granted the Motion to Suppress, see United States v. Xi, No. 16-22-5, 2018 WL 3340884 (E.D. Pa. July 6, 2018) (hereinafter "Xi I"), and denied the Motion to Dismiss/Sever, see Xi, 2018 WL 3648178 (hereinafter "Xi II").

In the Motion to Suppress, Defendant sought to suppress "any statements she made to the FBI Agents after she was taken into custody and invoked her right to counsel."  Xi I, at *8 (citing Doc. No. 160 at 1).  The Court ultimately granted the motion and suppressed all statements Defendant made after invoking her right to counsel because "she was not properly advised of her Miranda rights and because after invoking her right to counsel, the Agents coerced her into waiving her rights."  Id. at *9.  The Court specifically noted that, "[r]ather than informing Defendant Xi that counsel would be appointed for her free of charge if she could not afford it, Agent Winsett stated that no one would be appointed to represent her if she could not afford counsel."  Id.  "By

---

[1]   "In her Reply, Defendant Xi points out that the term 'Renopharma' was not mentioned in this email but that the Government inserted the word in brackets, 'suggesting without basis' that Defendant Xi intended her statement to refer to Renopharma."  United States v. Xi, No. 16-22-5, 2018 WL 3648178, at *4 n.4 (E.D. Pa. Aug. 1, 2018) (citing Doc. No. 179 at 2).

incorrectly informing Defendant Xi that no one would be appointed if she could not afford an attorney," the Court held that "the warnings did not reasonably convey to Defendant Xi her rights as required by <u>Miranda</u>." <u>Id.</u> at *12.  In addition, the Court held that Defendant's alleged waiver of her right to counsel was not voluntary because of "the inaccurate <u>Miranda</u> warnings and [Agent Winsett's] subsequent deceptive and coercive statement[2] about the complications of obtaining counsel[.]" <u>Id.</u> at *17.

In the Motion to Dismiss/Sever, Defendant sought to dismiss all "charges against her in the Superseding Indictment for prosecutorial misconduct" on the ground that "the Government charged her for the sole purpose of securing her cooperation against the other Defendants knowing that she is not criminally culpable for the offenses charged." <u>Xi II</u>, at *4.  "Alternatively, she contend[ed] that her trial should be severed from that of her co-Defendants because a jury will be unable to compartmentalize the evidence against her from the evidence against her co-Defendants, exposing her to a severe risk of prejudice if she [were to be] tried with them." <u>Id.</u>

The Court denied the motion, finding that the "only evidence of prosecutorial misconduct" presented by Defendant—"Agent Winsett's offhand remarks to [an] Amgen [employee][3] after Defendant's arrest and interview—was "insufficient to show that the Government charged

---

[2]  "[T]he <u>Miranda</u> warnings that Agent Winsett read to Defendant Xi were inaccurate because they informed her that if she could not afford an attorney, no one would be provided for her. Agent Winsett never corrected the warnings but instead <u>further confused the instructions by stating that Defendant Xi could get a lawyer appointed by the Court or could get a lawyer that she would pay for but that it would 'make [her] situation more complicated.'</u>"  <u>Xi I</u>, at *17 (second alteration in original) (emphasis added) (citing Doc. No. 186, Ex. A at 21).

[3]  "After the [FBI] Agents had finished interviewing Defendant Xi and before they left to take her to downtown Los Angeles for her initial court appearance, Agent Winsett spoke with four Amgen representatives" about "the allegations against Defendant Xi[.]"  <u>Xi II</u>, at *2.  The "offhand remarks" Agent Winsett made to one of the Amgen employees are now at issue in Defendant's Motion in Limine #1 (<u>see</u> Doc. No. 214) and are discussed at length in Section III.B.1.a, <u>infra</u>.

Defendant Xi solely for cooperation." Id. at *7. Agent Winsett's "comments alone [were] not enough to show that Defendant Xi was indicted without sufficient evidence and solely to secure [her] cooperation with the government in testifying against another." Id. (second alteration in original) (internal quotations omitted). Regarding severability, the Court held that "[s]everance [was] not warranted" because "Defendant Xi ha[d] not met her 'heavy burden' of showing that 'denial of severance would lead to clear and substantial prejudice resulting in a manifestly unfair trial.'" Id. at *9 (quoting United States v. Lore, 430 F.3d 190, 205 (3d Cir. 2005)). In other words, Defendant was "not entitled to a separate trial merely because the evidence against her co-Defendants may be more damaging or because she may have a better chance of acquittal if she [were] tried separately." Id.

In the months following the Court's rulings, co-Defendants Yu Xue and Tao Li pled guilty to conspiracy to steal trade secrets, in violation of 18 U.S.C. § 1832(a)(5), and co-Defendant Tian Xue pled guilty to conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).[4] (See Doc. Nos. 238, 241, 247.) After pleading guilty but before sentencing, the Court resolved a disputed issue regarding amount of loss to GSK under the Sentencing Guidelines, finding that the amount of loss GSK suffered "for Sentencing Guideline purposes [was] $0" and "no specific offense level enhancement under Section 2B1.1(b)(1) of the United States Sentencing Guidelines" would apply. United States v. Yu Xue, No. 16-22, 2020 WL 5645765, at *20 (E.D. Pa. Sept. 22, 2020); (Doc. No. 313 at 45).[5]

---

[4] Specifically, Yu Xue pled guilty on August 31, 2018, Tao Li pled guilty on September 17, 2018, and Tian Xue pled guilty on October 22, 2018. (See Doc. Nos. 237, 243, 248.)

[5] The Court's Sentencing Guidelines loss determination did not apply to co-Defendant Tian Xue, who pled guilty pursuant to a guilty plea agreement that contained an agreed upon sentence. (See Doc. No. 247 at 1-2 ¶ 2.)

Thereafter, the Court sentenced Yu Xue, Tao Li, and Tian Xue on May 26, 2021, June 9, 2021, and June 25, 2021, respectively.  (See Doc. Nos. 342-43, 353, 356, 366, 369.)  Co-Defendant Yan Mei has been and is still a fugitive.  (See Doc. Nos. 25, 123 at 3:13-15.)  Defendant Lucy Xi is proceeding to trial.

On August 4, 2021, the Court heard oral argument on a number of pending pretrial Motions pertaining to Defendant Xi.  The Motions are now ripe for disposition.

## III.   DISCUSSION

As noted, the following Motions are currently before the Court: (1) the Government's Motion in Limine to Exclude Evidence of Civil Complaint and its Allegations (Doc. No. 210), and the following Motions filed by Defendant Xi: (2) Motion in Limine #1: for Admission of FBI Special Agent Winsett's Admissions Regarding Ms. Xi (Doc. No. 214); (3) Motion in Limine #2: for Admission of Judicial Admissions (Doc. No. 216); (4) Motion in Limine #3: to Exclude October 11, 2013 E-mail from Ms. Xi to Mr. Mei (Doc. No. 217); (5) Motion in Limine #5: to Prevent the Government from Relitigating Conclusions of Law Made by this Court (Doc. No. 374); and (6) Motion to Suppress Confidential Marital Communications (Doc. No. 260).[6]  Each Motion will be discussed in turn.

### A.   The Government's Motion in Limine to Exclude Evidence of Civil Complaint and its Allegations

On August 1, 2018, the Government filed a Motion in Limine "to exclude evidence of the civil complaint filed on May 10, 2017 by Xiaoxing Xi against Federal Bureau of Investigation ("FBI") Special Agent Andrew Haugen, and any of the allegations contained therein, as

---

[6]   Defendant also filed a Motion in Limine to Admit Exculpatory Portions of Co-Defendant Tao Li's Statement (Doc. No. 218); however, the Motion is not addressed in this Opinion because at the hearing held on August 4, 2021, the Government proposed working with defense counsel to resolve the issues raised in the Motion regarding co-Defendant Tao Li.  See Oral Argument at 10:50:17-10:50:42, United States v. Lucy Xi, No. 16-22-5 (E.D. Pa. Aug. 4, 2021).

inadmissible under Rules 401, 402, 403, and 608 of the Federal Rules of Evidence." (Doc. No. 210 at 2.) In the Motion, the Government explains that "Xi[a]oxing Xi, an unrelated party to this action, filed a civil complaint . . . against Agent Haugen regarding a case wholly unrelated to this matter[,]" wherein Xiaoxing Xi alleged that "Agent Haugen violated [his] Equal Protection and Due Process rights" by "ma[king] false statements and representations and material omissions of facts in his reports, affidavits, and other communications with federal prosecutors, thereby initiating a malicious prosecution of [Xiaoxing] Xi." (Id. at 3; id., Ex. A ¶ 2.)

The Government contends that "Xi[a]oxing Xi's unfounded allegations filed in a civil complaint against Agent Haugen are irrelevant because [Xiaoxing] Xi is not a defendant in this case and the facts and circumstances alleged in the civil complaint are wholly unrelated to the offense conduct charged in the indictment in this case." (Doc. No. 210 at 4.) And even if the Court found the allegations relevant, the Government avers that they should still be excluded under Rule 403 because "the mere filing of a complaint against a law enforcement officer is not probative of truthfulness or untruthfulness and . . . its probative value is minimal as compared to the risk of unfair prejudice." (Id. at 4-5.) Lastly, the Government asserts that "[e]vidence of the pending civil lawsuit and the allegations set forth in the complaint against Agent Haugen are also inadmissible pursuant to Federal Rule of Evidence 608(b)." (Id. at 6.)

In her Response in Opposition, Defendant Lucy Xi argues that "the evidence is admissible under both 404(b) and 608(b) because it is being offered for a proper purpose, and is relevant and highly probative." (Doc. No. 227 at 1.) Defendant claims that the criminal charges brought against Xiaoxing Xi—which were ultimately dismissed—"were the result of Agent Haugen's false statement and representations to federal prosecutors and the Grand Jury." (Id. at 2.) "[A]pproximately three months after the charges against [Xiaoxing] Xi were dismissed due to

Agent Haugen's reckless investigation and selective testimony, Agent Haugen appeared before the Grand Jury to testify against the Defendants in this matter." (Id. at 3.) And "[t]wo weeks after [Xiaoxing] Xi filed his . . . civil rights lawsuit against Agent Haugen, Agent Haugen appeared before the Grand Jury again [in this case] to testify against the Defendants for the Superseding Indictment." (Id. at 8.) As such, Defendant avers that the allegations against Agent Haugen in Xiaoxing Xi's civil complaint are admissible under Rule 404(b) because they will be used as "further evidence of Agent Haugen's motives to shade the truth in [his] Grand Jury appearance, as well as his anticipated testimony in this case." (Id. at 8.) In Defendant's view, "[w]ith the [criminal] case against [Xiaoxing] Xi having collapsed, Agent Haugen had the motive to make sure that another case under his watch, . . . being investigated at the same time, does not also fall apart." (Id.)

Defendant also asserts that the civil complaint allegations are admissible under Rule 608(b) "because it is a means of impeaching Agent Haugen's credibility." (Id. at 10.) "Part of Defendant[ Xi's] defense rests on the theory that Agent Haugen conducted a malicious investigation and misrepresented critical facts before the Grand Jury[;]" therefore, "[a]ny undermining of Agent Haugen's credibility makes [Defendant Xi's] theory more probable to the jury." (Id.) Finally, Defendant asserts that the evidence is relevant because "a witness's credibility is 'always at issue[,]'" and "any minimal prejudicial effect to the [G]overnment's case is outweighed by the probative value . . . – that the [G]overnment's key witness may have been undermined by the motive to protect his reputation, job security, and personal liability." (Id. at 9-10.)

At the hearing on the Motions held on August 4, 2021, the Government noted that since the filing of its Motion in Limine, Xiaoxing Xi's allegations against Agent Haugen have been dismissed with prejudice. See Oral Argument at 9:56:47-9:57:07, United States v. Lucy Xi, No.

16-22-5 (E.D. Pa. Aug. 4, 2021); <u>Xiaoxing Xi v. Haugen</u>, No. 17-2132, 2021 WL 1224164 (E.D. Pa. Apr. 1, 2021).  Defendant nevertheless avers that the allegations are admissible under Federal Rules of Evidence 404(b) and 608(b).  <u>See</u> Oral Argument at 9:57:57-9:59:10.  The Government conversely avers that only substantiated allegations should be used as impeachment evidence.  <u>See</u> <u>id.</u> at 10:04:34-10:05:07.

Federal Rule of Evidence 401 provides that evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence[,]" and the "fact is of consequence in determining the action."  Fed. R. Evid. 401.  However, relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

Rule 404 provides that evidence of a prior bad act "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character[,]" but it may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(1)-(2).  Even if prior bad act evidence is offered for these reasons, the court may still exclude it "on the basis of th[e] considerations set forth in Rule 403, i.e., prejudice, confusion or waste of time."  Fed. R. Evid. 404(b) advisory committee's note to 1974 enactment.

Similarly, Rule 608(b) states that specific instances of conduct may be inquired into on cross-examination "if they are probative of the character for truthfulness or untruthfulness[,]" Fed. R. Evid. 608(b), but "Rule 608(b) is guided by the analysis required by Rule 403."  <u>United States v. Lundy</u>, 416 F. Supp. 2d 325, 331 (E.D. Pa. 2005).  "It is within the discretion of the trial court to decide if the questions on cross-examination relating to the prior conduct of the witness are

10

probative of truthfulness or untruthfulness and whether the probative value is outweighed by the prejudicial effect." Id.

Here, after the Government filed its Motion in Limine, the district court presiding over Xiaoxing Xi's civil suit dismissed the claims against Agent Haugen with prejudice. See Xiaoxing Xi, 2021 WL 1224164; (Civ. Docket No. 17-2132, Doc. Nos. 58-59). In dismissing the claims, the district court found that "there [was] no basis upon which to infer that Haugen intentionally or recklessly ignored exculpatory evidence or misrepresented information in order to secure the Indictment and the related searches and seizures[,]" and Xiaoxing Xi's allegations did not "support a plausible inference that Haugen made false, corrupt, knowing, or reckless representations to the grand jury, prosecutors, or judicial officials[.]" Xiaoxing Xi, 2021 WL 1224164, at *26.

Because Xiaoxing Xi's allegations against Agent Haugen have been dismissed for these reasons, the probative value of the allegations is substantially outweighed by the danger of unfair prejudice such that Rule 403 bars their admission. See United States v. Johnson, 195 F. App'x 52, 62 (3d Cir. 2006) (affirming district court's exclusion of allegations against police officers under Rule 403 "due to the fact that allegations of the Officers' theft have never been substantiated"); Dicks v. United States, No. 03-266, 2010 WL 11484356, at *6 (E.D. Pa. Sept. 8, 2010) (finding that the probative value of allegations in a civil lawsuit were "minimal in comparison to the grave risk of unfair prejudice" because the civil suit "never resulted in any finding of misconduct" and collecting cases that held the same); Lundy, 416 F. Supp. 2d at 333 (excluding evidence of the defendants' conduct under Rule 403 where the charged offense based on such conduct was "dismissed for lack of evidence"); United States v. Booker, No. 95-211, 1997 WL 214850, at *3 (E.D. Pa. Apr. 24, 1997), aff'd, 133 F.3d 911 (3d Cir. 1997) (holding that the probative value of

"unfounded or unsubstantiated allegations" of police officer wrongdoing "would be substantially outweighed by the risk of unfair prejudice").

On the same note, even though Rule 608(b) would allow specific instances of conduct to be inquired into on cross-examination if they are probative of Agent Haugen's character for truthfulness, inquiring into allegations that have been dismissed would be unfairly prejudicial and would run the risk of confusing the issues.  See Johnson, 195 F. App'x at 62 ("Even if it were admissible under Rule 608(b), . . . it would not be admissible under Rule 403 because its probative value would be substantially outweighed by the danger of unfair prejudice due to the fact that allegations . . . have never been substantiated."); Dicks, 2010 WL 11484356, at * 6 (explaining that the admission of "unproven allegations in an unrelated internal investigation and three civil lawsuits" to prove that officers were untruthful "would have redirected the focus of . . . trial, creating several mini-trials exploring the allegations and conduct . . . . Such evidence is plainly inadmissible and would have been distracting and confusing to the jury."); Booker, 1997 WL 214850, at *3 (collecting cases).[7]

At bottom, the now-dismissed allegations against Agent Haugen in Xiaoxing Xi's civil complaint are inadmissible under Rule 403 because their probative value is substantially

---

[7]   It is worth noting that while Defendant contends the allegations are admissible under Rule 404(b)(2) to show Agent Haugen's "motive to draw improper inferences and falsely exaggerate the facts in this case[,]" (Doc. No. 227 at 8), the purpose for which Defendant seeks to use this evidence appears to be plainly prohibited by 404(b)(1).  "Regardless of how [D]efendant frames [her] argument, [s]he seeks to get evidence of prior unfounded or unsubstantiated allegations of [untruthfulness] by [Agent Haugen] before a jury to suggest that" Agent Haugen was similarly untruthful in his investigation of this case and in his Grand Jury testimony. United States v. Booker, No. 95-211, 1997 WL 214850, at *2 (E.D. Pa. Apr. 24, 1997), aff'd, 133 F.3d 911 (3d Cir. 1997).  "This is clearly prohibited by Fed.R.Evid. 404(b)[(1)]." Id.; see also id. at *2 n.3 ("That defendant seeks to prove that Sergeant Payne used excessive force to establish a motive for planting a firearm does not alter the fact that one is being asked to find that Mr. Payne used excessive force on a particular occasion from evidence (or reports) that he did so on prior occasions.").

outweighed by the danger of unfair prejudice.  Accordingly, the Government's Motion in Limine to Exclude Evidence of Civil Complaint and its Allegations (Doc. No. 210) will be granted.

### B.      Defendant Lucy Xi's Pretrial Motions

#### 1.      Motions in Limine

Defendant Lucy Xi has filed Motions in Limine: (1) to admit FBI Special Agent David Winsett's admissions regarding Defendant; (2) to admit the Government's judicial admissions; (3) to exclude an email Defendant sent to co-Defendant Yan Mei on October 11, 2013; and (4) to prevent the Government from relitigating conclusions of law made by this Court.

##### a.      Motion to Admit FBI Special Agent Winsett's Admissions Regarding Defendant

In Defendant's first Motion in Limine, she asks the Court "to admit evidence of FBI Special Agent David Winsett's statements regarding Ms. Xi's lack of criminal culpability" on the ground that "the statements are admissions of a party opponent and [are] thus admissible under Federal Rule of Evidence 801(d)(2)."  (Doc. No. 214 at 1.)  Specifically, Defendant seeks to admit the following statements Agent Winsett made to an Amgen representative after Defendant's post-arrest interview:

> [Agent Winsett]:  And so, he was kind of – I think she's, to be honest, I think she[] could be naïve about the whole situation.  She's not real clear about what's there's and what's –
>
> [Amgen Representative]:  So it's pretty much how you outlined it [initially that]–
>
> [Agent Winsett]:  Yeah.
>
> [Amgen Rep.]:  She's a small fish and –
>
> [Agent Winsett]:  Yeah.
>
> [Amgen Rep.]:  You're trying to flip her.

13

> [Agent Winsett]: Exactly. And so, right now, it's hard to gauge but we don't believe that there's like, I guess, malicious intent to [to], you know, rob Glaxo[SmithKline] and then go, you know, make millions. We think the other group of individuals, they had planned to do that and were willing and want[ing] to do that so, she's gonna be actually a great witness for us. I think we just need to kinda keep her in the corral.

(Id. at 1-2).[8]

In Defendant's view, these statements by Agent Winsett show that "the [G]overnment knew Ms. Xi did not have any malicious intent to rob GSK and that the purpose of the charges against her was to coerce her to cooperate with the [G]overnment in its case against the other [co-]Defendants[.]" (Id. at 4.) Moreover, "[t]hese admissions are directly relevant to Ms. Xi's defense that she did not intend to commit, and did not commit, any crimes." (Id. at 5.) Defendant mainly relies upon United States v. Barile, 286 F.3d 749 (4th Cir. 2002) and United States v. Kattar, 840 F.2d 118 (1st Cir. 1988) to argue that "Agent Winsett made the statements in his capacity as a government official on matters within the scope of his employment[, and] . . . . Agent Winsett's admissions directly undermine the [G]overnment's charges against Ms. Xi." (Id. at 5.) As such, Defendant avers that Agent Winsett's statements are admissible under Rule 801(d)(2), and "the jury should be allowed to hear how Agent Winsett characterized the charges and evidence against Ms. Xi." (Id.)

In its Response in Opposition, the Government argues that "Agent Winsett's statements to the Amgen [representative] are inadmissible hearsay and should be excluded." (Doc. No. 224 at 9-10.) And "[s]eparate and apart from the admissibility of Agent Winsett's statements," it avers

---

[8]   Agent Winsett's statements were previously at issue in Defendant's Motion to Dismiss for Prosecutorial Misconduct/Motion to Sever. See supra note 3; Xi II, at *2.

that Defendant "selectively quotes portions of the record to inaccurately argue that Agent Winsett 'admitted on tape that the government knew Ms. Xi did not have any malicious intent to rob GSK.'"  (Id. at 13) (quoting Doc. No. 214 at 4).  However, "[a] review of the transcript in its totality reveals that Agent Winsett, who possessed limited information about [Defendant's] offense conduct because he was not part of the investigating team from the FBI Philadelphia Field Office, was speculating about [Defendant's] relative culpability based on a brief post-arrest interview." (Id.)[9]

The Government also submits that Defendant's reliance upon Barile and Kattar are "misplaced" because the cases are "readily distinguishable[,]" and because under Third Circuit precedent, "statements made by a law enforcement agent are not admissions by a party opponent under Rule 801(d)(2)."  (Id. at 10-12) (citing United States v. Kapp, 781 F.2d 1008 (3d Cir. 1986); Lippay v. Christos, 996 F.2d 1490 (3d Cir. 1993); United States v. Booker, 375 F. App'x 225 (3d Cir. 2010)).  Therefore, the Government avers that "Rule 801(d)(2) does not apply to Agent Winsett's statements because the statements of an individual agent do not bind the sovereign."  (Id. at 11.)  "Agent Winsett was not a member of the investigating team from the FBI Philadelphia Field Office[,]" his "involvement in the case related to the limited issue of arresting [Defendant] in California and conducting her post-arrest interview[,]" and his statements "are inadmissible hearsay and should be excluded."  (Id.)[10]

---

[9]   The Government continued by noting that "Agent Winsett did not have the benefit of reviewing the e-mails that [Defendant Xi] sent to [co-Defendant Yan Mei,] which make clear that she stole valuable documents from . . . GSK."  (Doc. No. 224 at 13.)  Moreover, "Agent Winsett acknowledged the limitation of his speculative statements when he told the Amgen [representative] to review [Defendant's] computer activity 'to know she's not pulling the 'I'm so innocent,' kind of card and you know she's a shark or something.'"  (Id.)

[10]   At the end of its Response in Opposition, the Government adds that "to the extent that this Court allows [Defendant Xi] to introduce any of Agent Winsett's statements under Rule

The Federal Rules of Evidence generally forbid hearsay, which is "'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'"  Booker, 375 F. App'x at 230 (citing Fed. R. Evid. 801(c)).  But the Rules carve out exceptions for statements that are not considered hearsay.  See Fed. R. Evid. 801(d).  For example, Rule 801(d)(2) provides that a statement is not hearsay if:

> The statement is offered against an opposing party and:
>
> (A) was made by the party in an individual or representative capacity;
>
> (B) is one the party manifested that it adopted or believed to be true;
>
> (C) was made by a person whom the party authorized to make a statement on the subject;
>
> (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or
>
> (E) was made by the party's coconspirator during and in furtherance of the conspiracy.

Fed. R. Evid. 801(d)(2).  Qualifying statements under Rule 801(d)(2) are commonly referred to as statements by a party-opponent.

Here, the parties both dispute whether Agent Winsett was a Government "agent" who made the statements within the scope of his employment.  In that regard, the Third Circuit has held that statements made by a government informant are not admissible as statements by a party-opponent's agent pursuant to Rule 801(d)(2)(D).  See Lippay, 996 F.3d at 1499.  In Lippay, the Third Circuit looked to "federal common law rules of agency" to hold that "federal courts will not impute the statements of a declarant to a party-opponent who is merely the declarant's co-

---

801(d)(2)(D)," it "will ask the Court to apply the rule of completeness set forth in Federal Rule of Evidence 106" and "will seek to present the entirety of the recording in order to provide fair and necessary context for the statements proffered by [Defendant Xi]."  (Doc. No. 224 at 14.)

employee." Id. at 1498. "Instead, an agency relationship is established only where the party-opponent personally 'directed [the declarant's] work on a continuing basis[]'" and "'controlled the daily performance of [the declarant] at the time he made the alleged admissions.'" Id. (alteration in original) (quoting Boren v. Sable, 887 F.2d 1032, 1040-41 (10th Cir. 1989)).

The Third Circuit also has held that a law enforcement officer is "not an agent of the United States for purposes of Rule 801(d)(2)." Booker, 375 F. App'x at 230. In Booker, the district court barred a defense witness from testifying about a statement a state detective made to her, finding that "the statement was neither an admission of a party-opponent under Rule 801(d)(2), nor admissible as impeachment evidence under Rule 613." Id. On appeal, the defendant argued that the detective's statement should have been admitted under 801(d)(2)(D) because the witness "was testifying about a statement made by a law enforcement officer, who is an agent working within the scope of his authority and in a representative capacity." Id. (internal quotations omitted). The Third Circuit disagreed. See id.

In affirming the district court's ruling, the Third Circuit first noted that "several courts, including ours, 'have held that statements by police officers or other law enforcement officials are not admissible on an admissions theory as substantive evidence against the sovereign in a criminal prosecution.'" Id. (quoting Lippay, 996 F.2d at 1497; then citing United States v. Arroyo, 406 F.3d 881, 888 (7th Cir. 2005) (noting that "government agents are not party-opponents for purposes of Rule 801(d)(2)"); and Kapp, 781 F.2d at 1014 ("There is no authority for the proposition that the prosecution is a 'party' against whom [Rule 801(d)(2)] evidence can be offered.")). The court then explained that "an agency relationship under Rule 801(d)(2) requires the party-opponent to personally supervise the declarant's work on a continuing basis," and the defendant "failed to offer any factual support for the existence of an agency relationship between the United States and the

17

[state] detectives whose statement he sought to admit." Id. at 231 (quoting Lippay, 996 F.2d at 1498).

Based on the reasoning in Lippay and Booker, this Court does not find that Agent Winsett's statements are admissible as statements by a party-opponent's agent under Rule 801(d)(2). "As the proponent of the evidence," Defendant Xi had the burden of proving that Agent Winsett "made th[e] statement[s] within the scope of an agency relationship" with the Government. Lippay, 996 F.2d at 1497. The Court is not convinced that Defendant met that burden. In her Motion, Defendant only states that "Government admissions are routinely admissible in criminal proceedings under Rule 801(d)(2)[,]" and she supports this contention by citing to Barile, Kattar, and other case law outside of the Third Circuit. (Doc. No. 214 at 2-4.) While other circuit court rulings can prove persuasive in the absence of Third Circuit authority, that is not the case here.[11]

In stark contrast to the arguments in Defendant's Motion, the Government provides numerous reasons why Agent Winsett is not its "agent" under 801(d)(2)(D). It explains that Agent Winsett's "involvement in the case related to the limited issue of arresting [Defendant] in California and conducting her post-arrest interview[,]" and he "possessed very limited information about [Defendant Xi's] offense conduct as [he was not] part of the investigating team from the FBI

---

[11] Defendant does acknowledge United States v. Booker in her Motion as "[t]he most relevant case on this issue in the Third Circuit[,]" but she asserts that it is distinguishable because "the law enforcement agent making the statement in that case was a police officer employed by Newark, New Jersey, and thus not an agent of the United States under the plain language of Rule 801(d)(2)[,]" whereas here, "Agent Winsett, as an FBI agent, is an agent of the United States." (Doc. No. 214 at 4 n.5.) The court in Booker, however, plainly held that the state police officer was not an agent of the United States on the ground that "statements by police officers or other law enforcement officials are not admissible on an admissions theory as substantive evidence against the sovereign in a criminal prosecution." United States v. Booker, 375 F. App'x 225, 230 (3d Cir. 2010) (quotations omitted) (quoting Lippay v. Christos, 996 F.2d 1490, 1497 (3d Cir. 1993)). The Third Circuit did not make any distinctions between state and federal law enforcement in reaching this holding; therefore, Defendant's attempt to distinguish Booker from the instant case is without merit.

Philadelphia Field Office." (Doc. No. 224 at 2, 11.) Prior to conducting the post-arrest interview, Agent Winsett "had only reviewed the complaint and arrest warrant for [Defendant Xi] and had, at most, two conversations with the case agent regarding the case." (Id. at 2 n.1.) He also "did not have the benefit of reviewing the e-mails that [Defendant Xi] sent to [co-Defendant Yan Mei] which make clear that [Defendant] stole valuable documents from . . . GSK." (Id. at 13.) This description of Agent Winsett's limited role in the investigation makes clear that the Government did not direct or supervise his work "on a continuing basis." Lippay, 996 F.2d at 1498 (quoting Boren, 887 F.2d at 1041). Rather, the Government only directed Winsett to arrest Defendant Xi and conduct the limited post-arrest interview. (See Doc. No. 224 at 11.) Once Defendant's interview ended, Agent Winsett's role in the investigation ostensibly ended as well.[12]

Therefore, because Defendant has not met her burden of establishing an agency relationship between Agent Winsett and the Government, and because Agent Winsett's statements "cannot bind the United States in a criminal prosecution," his statements "cannot be considered an admission of a party-opponent under Rule 801(d)(2)." Booker, 375 F. App'x at 231. Accordingly, Defendant's Motion in Limine #1: for Admission of FBI Special Agent Winsett's Admissions Regarding Ms. Xi (Doc. No. 214) will be denied.

---

[12] Furthermore, as this Court stated in its Opinion denying Defendant's Motion to Dismiss/Sever, "Agent Winsett was not the case agent. There is no allegation or evidence that the case agent or the prosecutor adopted his statements." Xi II, at *7 n.6. There also is no evidence to suggest that Agent Winsett played a role in determining whether the Government would attempt to "flip" Defendant and use her as a witness against her co-Defendants. See generally § 8:55 Admissions by employees or agents under Rule 801(d)(2)(D)—Related to duties; personal knowledge, 4 FEDERAL EVIDENCE § 8:55 (4th ed.) ("In connection with . . . discretionary matters, . . . it seems that the speaker must have some role in the relevant decisionmaking or policy-formulating process at hand in order to satisfy the [hearsay] exception [under 801(d)(2)(D)].").

#### b.        Motion to Admit Judicial Admissions

In Defendant Xi's second Motion in Limine, she asks the Court to "admit into evidence certain statements made by the [G]overnment in its pleadings and in open court." (Doc. No. 216 at 1.) She points to a number of assertions the assigned Assistant United States Attorney ("AUSA") has made about her and argues that the "assertions constitute admissions by the [G]overnment that Ms. Xi's role in the alleged offenses was minimal, at best." (Id.) She specifically points to the following statements made by the AUSA:

- "A comparison of LUCY XI's offense conduct to her co-defendants supports the conclusion that LUCY XI was a 'small fish' or 'smaller fish' than her co-defendants as the volume of information which she allegedly stole from GSK is significantly less than codefendant, YU XUE . ." (Doc. [No.] 165 p. 6.)

- "As noted above, LUCY XI's role in this offense was less than that of her co-defendants." (Doc. [No.] 165 p. 7.)

- "It is true that Ms. Xi is essentially charged in the indictment with sending two emails to her husband or ex-husband, Yan Mei, one which contained trade secret information, the other which contained confidential information." (Transcript of April 30, 2018 Hearing, p. 77:5-8.)

- "So is the quantum of evidence less against Ms. Xi than against one of the other defendants? Absolutely, your Honor." (Transcript of April 30, 2018 Hearing, pp. 77:25- 78:2.)

(Id. at 1-2.) Defendant also notes that the AUSA "has . . . stated on the record that 'if this case comes to trial, [it would] be more than happy to stipulate to the grocery store of information on the defendants' computers that's trade secret and confidential in which they did not steal[.]" (Id. at 2.) In sum, Defendant believes these assertions are "judicial admissions" which serve "to remove that fact from contention" and should be treated "as established for purposes of the case." (Id. at 4.) Therefore, she seeks to "introduce into evidence the [AUSA's] judicial admissions . . .

and preclude the [G]overnment from introducing any evidence or from making any argument contrary to these judicial admissions." (Id. at 5.)

In its Response, the Government argues that "there is no legal basis to grant [D]efendant's motion to admit [G]overnment counsel's statements into evidence, whether those statements were made pre-trial or during the course of the trial[,]" because "[t]he statements of [G]overnment counsel in the pretrial pleadings are not evidence and are not admissible under the doctrine of judicial admission." (Doc. No. 220 at 4.)  "That being said," the Government also avers that "[t]he representations which [it] made during the pretrial pleadings were accurate" and it "has no intention of presenting argument contrary to the representations and characterizations made in the pretrial pleadings." (Id. at 4.)  "If the [G]overnment made representations to the contrary during the course of the trial, [it] may be violating his and her duty of candor to the Court." (Id.) Therefore, the Government asks the Court to deny Defendant's Motion "without prejudice for [her] to re-raise the issue during the course of the trial should the [G]overnment make argument contrary to [its] prior representations to the Court." (Id. at 1.)

Judicial admissions are formal concessions in "pleadings, stipulations [or the like] which do not have to be proven in the same litigation.'" Anderson v. C.I.R., 698 F.3d 160, 167 (3d Cir. 2012) (quoting Giannone v. U.S. Steel Corp., 238 F.2d 544, 547 (3d Cir. 1956)); see also Parilla v. IAP Worldwide Servs., VI, Inc., 368 F.3d 269, 275 (3d Cir. 2004) (quotations omitted) (quoting Keller v. United States, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995)) ("Judicial admissions are formal concessions in the pleadings, or stipulations by the party or its counsel, that are binding upon the party making them.").  "To be binding, judicial admissions 'must be statements of fact that require evidentiary proof, not statements of legal theories.'" Id. (quoting In re Teleglobe Commc'ns Corp., 493 F.3d 345, 377 (3d Cir. 2007)).   Judicial admissions also must be an "unequivocal

acknowledgment of the fact in question." <u>Statements in pleadings and related documents</u>, 4 JONES ON EVIDENCE § 27:33 (7th ed.).

In order for a party to formally "concede" a fact, however, the party must have previously disputed the fact. <u>See</u> <u>Concession</u>, OXFORD ENGLISH DICTIONARY, https://www.oed.com/view/Entry/38189?redirectedFrom=concession#eid (last visited Aug. 30, 2021) ("The surrender of a disputed point or position[.]"). Moreover, "[t]he 'judicial admission' doctrine is a matter of <u>civil</u> procedure[] rather than evidence," 4 JONES ON EVIDENCE, <u>supra</u> (emphasis added), and this Court is not aware of a case within the Third Circuit that has recognized judicial admissions in a criminal case.[13]

Here, as noted above, the Government states that "[t]he representations which [it] made during the pretrial pleadings were accurate" and it "has no intention of presenting argument contrary to the representations and characterizations made in the pretrial pleadings." (Doc. No. 220 at 4.) Because the Government does not dispute the factual contentions Defendant seeks to admit, the Court is not convinced that they constitute judicial admissions as they are not "formal concessions." <u>See</u> <u>Parilla</u>, 368 F.3d at 275. The Court also is hesitant to deem certain statements judicial admissions in this criminal case when the Third Circuit has only recognized judicial admissions in civil litigation.

Accordingly, Defendant's Motion in Limine #2: for Admission of Judicial Admissions (Doc. No. 216) will be denied without prejudice. In the event the Government opens the door at trial to the factual matters raised in this Motion, Defendant may renew her Motion at that time.

---

[13]   The statements Defendant seeks to admit as judicial admissions appear to be incriminatory. Although the statements highlight her minimal role in the alleged conspiracy (<u>see</u> Doc. No. 216 at 1-2), as noted in Section III.B.1.c, <u>infra</u>, individuals who play a minimal role but nevertheless "knowingly participate with the core members and others to achieve a common goal" may be coconspirators. <u>United States v. Boyd</u>, 595 F.2d 120, 123 (3d Cir. 1978).

     **c.**     **Motion to Exclude October 11, 2013 E-mail from Defendant Xi to Co-Defendant Yan Mei**

In Defendant's third Motion in Limine, she seeks "to exclude from evidence at trial an email dated October 11, 2013, that [she] sent to her then husband [co-Defendant] Yan Mei[,]" on the ground that "the email is not relevant to any of the charges against Ms. Xi, and to the extent it is relevant, its probative value is substantially outweighed by a significant danger of unfair prejudice." (Doc. No. 217 at 1.) Defendant explains that "the email is actually a chain of three emails[,]" (id.), and she describes the email chain as follows:

> The first email was sent on October 10, 2013, and was between three GSK Asian American employees (none of whom are involved in this case) with a link to an article in [a newspaper] regarding two former Eli Lilly scientists who were indicted for stealing trade secrets. The email included the following note: "Want your opinion on this. Is it appropriate for you to forward this article to GSK Chinese community? Do not want to offend anyone, but I thought it is a good learning for all of us."
>
> The second email in the chain was sent on October 11, 2013 from Ren Xie, the chair of GSK's Asian Employee Association and one of the recipients of the first email, to over two-hundred GSK employees of Asian descent with the notation "FYI." Ms. Xi was a recipient of this email.
>
> The third email in the chain is Ms. Xi forwarding the chain to her then-husband, Yan Mie [sic], with no additional text . . . . None of Ms. Xi's alleged co-conspirators, except for her then-husband, are included as recipients of this email.

(Id. at 1-2.) Defendant contends that "[t]he October 11, 2013 email from Ms. Xi to Mr. Mei is not relevant" because "[i]t is not evidence of any conspiracy whatsoever." (Id. at 2.) "The email contains no text from Ms. Xi to Mr. Mei and none of the alleged co-conspirators [are] included as . . . recipient[s] on the email."[14] (Id.) And "when read in conjunction with the same email

---

[14] Yan Mei is a co-Defendant in this case; therefore, the Court will assume Defendant Xi's statement to mean that the three other co-Defendants—Yu Xue, Tao Li, and Tian Xue—were not recipients of the email.

circulated among over 200 Asian Americans at GlaxoSmithKline and Ms. Xi's alleged co-[D]efendants," she submits that the October 11, 2013 email "does not begin to establish that [she] was involved in any alleged conspiracy with her co-[D]efendants." (Id. at 3.)  "Rather, the email appears to be an attempt by the [G]overnment to take an innocuous email sent by Ms. Xi and try to use it impermissibly to extend the timeline for her alleged involvement in a conspiracy." (Id.) Therefore, Defendant asserts that the email "is entirely irrelevant to the charges against Ms. Xi, and even if relevant, would be far more prejudicial to Ms. Xi than probative of any involvement by her in any criminal conduct." (Id.)

In its Response in Opposition, the Government believes Defendant "flails in vain to find a basis for excluding this highly incriminating e-mail." (Doc. No. 221 at 5.)  At the outset, the Government makes clear that it is only seeking to introduce the October 11, 2013 email from Defendant Xi to co-Defendant Yan Mei, it "is not seeking to introduce the two lines . . . written by one GSK employee to another GSK employee, neither of whom are witnesses in this case or have anything to do with this investigation or prosecution[,]" and it will "redact those two lines from [its] proposed exhibit." (Id. at 3 n.1.)

In addressing the email's relevancy and probative value, the Government avers that the email is relevant because it "is charged as Overt Act 41 in the Superseding Indictment[,]" and "[t]he legal precedent that a charged overt act is axiomatically relevant to the offense conduct stretches back nearly 80 years." (Id. at 1, 4.)  The "logical inference" that can be drawn from the email is that Defendant Xi "knew that [co-Defendant Yan Mei] was participating in a conspiracy to steal trade secrets from GSK and . . . the e-mail . . . constituted a warning to be careful about this criminal conduct, as the superseding indictment specifically alleged." (Id. at 4.)  The Government also notes that Defendant "has not even offered an innocent explanation for this e-

24

mail[,]" and "[e]ven if [she] could provide some alternative explanation for why she sent the e-mail, th[e] explanation would not be sufficient under the law to exclude the e-mail from the jury's consideration" because "[i]t is the province of the jury to weigh and consider the parties competing argument as to the proper inference to be drawn from this e-mail."  (Id.)  In the Government's view, "[t]he October 11, 2013 [email] is the epitome of circumstantial evidence from which the jury can draw reasonable inferences, such as the inference that [Defendant Xi] knew [co-Defendant Yan Mei] was receiving stolen GSK trade secrets."  (Id. at 5.)

Finally, the Government avers that the probative value of the email "is extremely high" and "[t]he only possibly prejudicial material in the e-mail are the comments from the other GSK employee, which the [G]overnment has already agreed to excise from the exhibit."  (Id. at 7.)  And despite the fact that Defendant "does not even attempt to articulate a basis to suppress pursuant to Rule 403[,]" which "does not offer protection against evidence that is merely prejudicial, in the sense of being detrimental to a party's case[,]" but "only protects against evidence that is unfairly prejudicial[,]" the Government proposes that "any conceivable unfair prejudice may be ameliorated through a jury instruction."  (Id. at 6-7.)

As noted in Section III.A, supra, evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence[,]" and the "fact is of consequence in determining the action."  Fed. R. Evid. 401.  "Rule 401's definition of relevance is 'very broad' and 'does not raise a high standard.'"  United States v. Leake, 396 F. App'x 898, 903 (3d Cir. 2010) (quoting Gibson v. Mayor & Council of Wilmington, 355 F.3d 215, 232 (3d Cir. 2004)).  Even if a piece of evidence is "not itself an ultimate fact," it is still relevant if "its demonstration [is] a step on one evidentiary route to the ultimate fact[.]"  Old Chief v. United States, 519 U.S. 172, 179 (1997).  "[O]therwise relevant evidence is not rendered irrelevant simply because other related

evidence exists." United States v. Manigault, No. 17-90-01, 2019 WL 3775849, at *3 (E.D. Pa. Aug. 9, 2019) (citing Old Chief, 519 U.S. at 179).

Here, the October 11, 2013 email from Defendant Xi to co-Defendant Yan Mei is relevant evidence. The Superseding Indictment charged Defendant Xi, co-Defendant Yan Mei, and three others with conspiracy to steal trade secrets. (See Doc. No. 125.) It logically follows that Defendant's Xi email to Yan Mei, which she forwarded during the alleged conspiracy and which contained a news article about Eli Lilly scientists indicted for stealing trade secrets, is evidence the Government can use in its "evidentiary route" to prove the "ultimate fact"—that Defendant engaged in a conspiracy to steal trade secrets. Old Chief, 519 U.S. at 179; see also United States v. Vaghari, 500 F. App'x 139, 147 (3d Cir. 2012) (holding that emails "between [the defendant] and his co-conspirators about items for customers in Iran is relevant to the charge that [the defendant] and others conspired to ship items to customers in Iran.").

The October 11, 2013 email also will not be excluded under Rule 403. A court may exclude relevant evidence" under Rule 403 "if its probative value is substantially outweighed by a danger of" unfair prejudice. Fed. R. Evid. 403. "Evidence cannot be excluded under Rule 403 merely because its unfairly prejudicial effect is greater than its probative value. Rather, evidence can be kept out only if its unfairly prejudicial effect 'substantially outweigh[s]' its probative value." United States v. Bailey, 840 F.3d 99, 119 (3d Cir. 2016) (internal quotations and footnote omitted). Importantly, "Rule 403 bars not all prejudice, but only unfair prejudice." United States v. Heatherly, 985 F.3d 254, 266 (3d Cir. 2021) (citing United States v. Bergrin, 682 F.3d 261, 279 (3d Cir. 2012)). "It does not protect defendants from devastating evidence in general." Id. "[T]he fact that probative evidence helps one side prove its case obviously is not grounds for excluding it under Rule 403." Vaghari, 500 F. App'x at 148 (quotations and citation omitted).

Here, Defendant's only argument for excluding the email under Rule 403 is that its admission "would be far more prejudicial to Ms. Xi than probative of any involvement by her in any criminal conduct[,]" further suggesting that the Government seeks to "impermissibly" use the "innocuous email" to "extend the timeline for her alleged involvement in a conspiracy." (Doc. No. 217 at 3.)   But the Government "can rely entirely on circumstantial evidence" to prove that Defendant was engaged in a conspiracy, so long as "the inferences drawn from the circumstantial evidence 'have a logical and convincing connection to the facts established.'"   United States v. Navarro, 145 F.3d 580, 593 (3d Cir. 1998) (quoting United States v. Carr, 25 F.3d 1194, 1201 (3d Cir. 1994)).   Given that Defendant Xi worked at GSK from 2008 to 2015, (see Doc. No. 125 at 4 ¶ 10; 7 ¶¶ 14, 16), and the alleged conspiracy to steal GSK trade secrets existed from 2012 until 2016, (see id. at 8 ¶ 18; 28 ¶ 7; 43-44 ¶¶ 88-95), a jury could logically connect the email to other facts to infer that Defendant was engaged in the conspiracy.

Furthermore, Defendant's contention that the Government is attempting to use the email "impermissibly to extend the timeline for her alleged involvement in a conspiracy" (Doc. No. 217 at 3) is without merit because "[t]he gist of a criminal conspiracy . . . may continue over an extended period of time and involve numerous transactions." United States v. Boyd, 595 F.2d 120, 123 (3d Cir. 1978).   Individuals "who knowingly participate with the core members and others to achieve a common goal" may be coconspirators, id., and "[a] conspiracy is presumed to continue until its objective is achieved." United States v. Ammar, 714 F.2d 238, 253 (3d Cir. 1983).[15]

---

[15]   As the Third Circuit has explained:

> Common design is the essence of conspiracy.  The crime may be committed whether or not the parties comprehend its entire scope, whether they act separately or together, by the same or different means, known or unknown to some of them, but ever leading to the same unlawful result. . . . All conspirators need not be acquainted with one another, nor need they have originally

Therefore, the probative value of the October 11, 2013 email is not substantially outweighed by any unfair prejudice Defendant suggests exists.

Accordingly, Defendant's Motion in Limine #3: to Exclude October 11, 2013 E-mail from Ms. Xi to Mr. Mei (Doc. No. 217) will be denied.

> **d.    Motion to Prevent the Government from Relitigating Conclusions of Law Made by This Court**

In Defendant's last Motion in Limine, she asks the Court to "follow its prior ruling in this case" regarding "the cost of developing the allegedly stolen information, its fair market value, the alleged amount of damages allegedly sustained by GSK as a result of the alleged conspiracy, and/or the damages Defendants allegedly purposefully sought to inflict on GSK."  (Doc. No. 374 at 1.) Defendant specifically refers to the Court's September 22, 2020 Opinion and Order discussed in Section II, supra, in which it held that "for purposes of Section 2B1.1 of the Sentencing Guidelines, 'the amount of loss in this case is $0.'"  (Id. at 3 ¶ 9) (quoting Yu Xue, 2020 WL 5645765, at *20; (Doc. No. 313 at 45)).  Because the Court "looked at the loss from the perspective of the overall conspiracy," and "[b]ecause the law-of-the-case doctrine applies," Defendant asserts that "the Court should follow its prior ruling in this case and not allow the [G]overnment to relitigate these fundamental legal issues or argue these issues before the jury at trial."  (Id. at 1, 5.)

In its Response, the Government avers that Defendant's Motion "vastly exceeds the scope of the [C]ourt's September 22, 2020" Opinion and Order because "[D]efendant conflates the issue of fraud loss under the sentencing guidelines, which is not an element of the offense, with the issues of 'a scheme to defraud or to obtain money or property' and 'independent economic value'

---

conceived or participated in the conception of the conspiracy.  Those who come on later and co-operate in the common effort to obtain the unlawful results become parties thereto and assume responsibility for all done before.

United States v. Lester, 282 F.2d 750, 753 (3d Cir. 1960).

under 18 U.S.C. § 1839(3), which are elements of the charged offenses."  (Doc. No. 378 at 3-4.)

In actuality, "[t]hese are two separate issues.  The [C]ourt's September 22, 2020 [O]rder pertained

to calculating the sentencing guidelines, while [D]efendant['s] motion pertains to excluding

evidence of the elements of the offense at trial."  (Id. at 5.)  "In this regard, evidence of the cost of

developing the stolen information and its fair market value are relevant to prove the elements of

charge[d] offenses and the underlying motive for committing the crime."  (Id.)  Therefore, the

Government suggests that, "[s]hould [Defendant] be convicted at trial, . . . . then [her] arguments

on the 'law of the case' may very well be applicable to the sentencing guidelines calculation."  (Id.)

But "[t]o the extent that [Defendant] moves this [C]ourt to expand its ruling beyond the clearly

defined issues decided in the September 22, 2020 [O]rder, this [C]ourt should decline that

invitation."  (Id.)

"The law of the case doctrine directs courts to refrain from re-deciding issues that were

resolved earlier in the litigation."  Pub. Int. Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc.,

123 F.3d 111, 116 (3d Cir. 1997).  The doctrine "prevents courts from entertaining endless appeals

on the same issue," and it "promotes finality and judicial economy."  Id.  In the Third Circuit, "for

the law of the case doctrine to apply, the same parties must have been involved in the earlier

decision."  United States v. Hodge, 389 F. App'x 96, 104 n.8 (3d Cir. 2010).

Here, the case caption in the Court's September 22, 2020 Order and Opinion shows that

the ruling on fraud loss pertained to all five Defendants charged with conspiring to steal trade

secrets—one being Defendant Xi.  (See Doc. Nos. 313-14.)  But the Government is correct that

the Court's ruling only pertained to "specific offense level enhancement[s] under Section

2B1.1(b)(1) of the United States Sentencing Guidelines[.]"  Yu Xue, 2020 WL 5645765, at *20;

(Doc. No. 313 at 45).  Thus, while "the 'law of the case' may very well be applicable to [Defendant

29

Xi's] sentencing guidelines calculation[,]" (Doc. No. 378 at 5), the Court's ruling does not extend into other stages of the case.

This conclusion is further buttressed by the fact that, as the Government notes in its Response, Defendant Xi is charged with "various wire fraud and theft of trade secret offenses" and is proceeding to trial on those charges.  (Id. at 1.)  At trial, in order for the Government to prove beyond a reasonable doubt that Defendant violated 18 U.S.C. § 1832(a)(5)—conspiracy to steal trade secrets—it must prove that the information Defendant allegedly conspired to steal from GSK meets the legal definition of "trade secret" under 18 U.S.C. § 1839(3).[16]  In other words, the Government must show that "the stolen trade secrets had independent economic value [actual or potential] under 18 U.S.C. § 1839(3)."  (Id. at 4.)  The Court will not restrict the Government from proving this element of the offense with evidence of the value of the stolen property or the cost of development.

---

[16]  18 U.S.C. § 1839(3) defines "trade secret" as:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3) (emphasis added).

At bottom, the issue raised in Defendant's Motion in Limine is premature. Once Defendant proceeds to trial, and in the event she is convicted of conspiracy to steal trade secrets, she may raise the issue of loss under the Federal Sentencing Guidelines prior to sentencing. Accordingly, Defendant's Motion in Limine #5: to Prevent the Government from Relitigating Conclusions of Law Made by this Court (Doc. No. 374) will be denied.

### 2.      Motion to Suppress Confidential Marital Communications

The final Motion filed by Defendant Xi is a Motion to Suppress "certain . . . communications with her then-husband, [co-Defendant] Yan Mei, . . . on the ground[] that they constitute inadmissible confidential marital communications." (Doc. No. 260 at 1) (footnote omitted). The communications consist of the October 11, 2013 email[17] from Defendant Xi to Yan Mei and "electronic chats that occurred on July 27, 2012, July 31, 2012, August 28, 2012, and September 4, 2012." (Id. at 1 n.1; see also id., Exs. C-H.) In short, Defendant avers that these communications "satisfy the standard on confidential marital communications applied in the Third Circuit" because: (1) her and Yan Mei "were married at the time the communications occurred[;]" (2) she "intended the email and chat communications to be between her and her then-husband[;]" and (3) she "had a reasonable expectation of privacy as to the content of those communications." (Id. at 3.) Defendant also "anticipates the [G]overment will argue that the communications at issue fall within the crime-fraud exception[,]" but "since the [G]overnment has not and cannot meet its heavy burden of showing that the communications were made in furtherance of the alleged criminal activity," she asserts that "the communications are inadmissible." (Id. at 6, 8.)

As anticipated, in its Response the Government argues that "[t]he crime fraud exception applies to the electronic communications between [Defendant Xi] and [Yan Mei] and are

---

[17]   This is the same email at issue in Defendant's third Motion in Limine discussed in Section III.B.1.c, supra.

admissible" because they "show[] that the conspiracy to steal trade secrets from GSK occurred over email" and they "provide critical context to understand why [Defendant] stole GSK trade secrets and e-mailed them to [Yan Mei]." (Doc. No. 269 at 4-5.) The Government asserts that the July 31, August 28, and September 4, 2012 electronic chats[18] show "the pair discuss[ing] how [Yu Xue] would remain at GSK long enough to steal the necessary trade secrets that they could use for Renopharma and profit from the windfall of reproducing GSK's current and future stolen information without spending significant time and capital on research and development." (Id. at 5.) And as for the October 11, 2013 email, the Government asserts it "is admissible not only because it does not qualify as a confidential marital communication, . . . but also because the communication was in furtherance of the conspiracy." (Id. at 9.)

"Federal courts have recognized two kinds of marital privilege: the privilege that protects confidential marital communications and the privilege that protects a witness from testifying against his/her spouse." In re Grand Jury, 111 F.3d 1083, 1085 (3d Cir. 1997).[19] The confidential marital communications privilege prohibits the admission of communications "privately disclosed between husband and wife in the confidence of the marital relationship." Trammel v. United States, 445 U.S. 40, 51 (1980) (citing Blau v. United States, 340 U.S. 332 (1951)). The privilege is "held by both spouses" and it "can be asserted even after the marriage ends[,]" United States v. Tartaglione, 228 F. Supp. 3d 402, 407 (E.D. Pa. 2017), but "[i]t reaches only those communications

---

[18]   The Government does not dispute that the July 27, 2012 electronic chat is a confidential marital communication to which the crime-fraud exception does not apply. (See Doc. No. 269 at 5-6 n.2.)

[19]   The second kind of marital privilege—the privilege that protects a witness from testifying against their spouse—is not applicable here. Defendant Xi's former spouse, co-Defendant Yan Mei, is not being used by the Government as a witness against Defendant. And as noted in Section II, supra, Yan Mei is a fugitive.

made in confidence" that are "intended to be confidential." Ammar, 714 F.2d at 258 (internal quotations omitted). Moreover, "[t]he privilege extends only to utterances, not acts." United States v. Hill, 967 F.2d 902, 911 n.13 (3d Cir. 1992) (citing Pereira v. United States, 347 U.S. 1, 6 (1954)). "[O]nly in the rare instances where the conduct was intended to convey a confidential message from the actor to the observer" may the privilege extend to a spouse's conduct. Id. (quotations omitted) (quoting United States v. Estes, 793 F.2d 465, 467 (2d Cir. 1986)).

Under the crime-fraud exception, however, "conversations between spouses that would otherwise be protected from disclosure are admissible when the conversations were 'in furtherance of a crime or fraud in which the speaker was a knowing participant . . . or where the husband and wife are joint participants in criminal activity whether or not each spouse is prosecuted.'" Tartaglione, 228 F. Supp. 3d at 408 n.3 (quoting Andrews v. Holloway, 256 F.R.D. 136, 147 (D.N.J. 2009)); see also Hill, 967 F.2d at 911 (internal quotations omitted) ("[W]here marital communications have to do with the commission of a crime in which both spouses are participants, the conversation does not fall within the marital privilege."); Ammar, 714 F.2d at 258 (holding that conversations between spouses that were made "in furtherance of the conspiracy" were "not protected against disclosure by the privilege for confidential marital communications."). "The crime-fraud exception was originally established as a caveat to the attorney-client privilege" but has since been applied to the marital communications privilege. See Chester Cnty. Hosp. v. Indep. Blue Cross, No. 02-2746, 2003 WL 25905471, at *5 (E.D. Pa. Nov. 10, 2003).

"[T]o invoke the exception, the [G]overnment must make a prima facie showing that (1) the [defendant] was committing or intending to commit a fraud or crime, . . . and (2) the [spousal] communications were in furtherance of that alleged crime or fraud[.]" In re Grand Jury Subpoena, 223 F.3d 213, 217 (3d Cir. 2000). "A 'prima facie showing' requires presentation of 'evidence

which, if believed by the fact-finder, would be sufficient to support a finding that the elements of the crime-fraud exception were met.'"  Id.  The Government's "burden is not a particularly heavy one."  In re Grand Jury Investigation, 445 F.3d 266, 274 (3d Cir. 2006).  After all, "prima facie evidence" does not mean "'enough to support a verdict in favor of the person making the claim.'"  Id. at 275 (quoting In re Feldberg, 862 F.2d 622, 624 (7th Cir. 1988)).

Upon review of the July 31, August 28, and September 4, 2012 electronic chats and the October 11, 2013 email, the Court finds that the spousal communications are admissible evidence. Despite the fact that Defendant and Yan Mei "were married at the time the communications occurred . . . and that Ms. Xi intended the email and chat communications to be between her and her then-husband," (Doc. No. 260 at 3), the crime-fraud exception applies because the communications were made during and in furtherance of the alleged conspiracy.

### a.       July 31, 2012 Electronic Chat

The first electronic chats which Defendant seeks to suppress occurred on July 31, 2012. (See Doc. No. 260, Exs. D-E.)  The first electronic chat on July 31 reads as follows:

> [Defendant]:  :)
>
> [Defendant]:  some thoughts just came across my mind
>
> [Yan Mei]:  ok
>
> [Defendant]:  When you were asked will all three be working on it full time
>
> [Defendant]:  You can simply answer "yes"
>
> [Yan Mei]:  sure,
>
> [Defendant]:  [Yu Xue] promised she will quit in one or two years
>
> [Defendant]:  So you can see [sic] "yes' to that question
>
> [Defendant]: Get the money first

34

[Defendant]:  :)

[Yan Mei]:  that is our plan

[Defendant]:  oh, you did not tell me

[Defendant]:  I think it is reasonable to do that

[Yan Mei]:  we have to do that

[Defendant]:  that is a good solution

[Defendant]:  Don[']t offer details until they check for [Yu Xue's] status

[Defendant]:  I think when you answer Yes to that qustion [sic], nobody will ask more

[Yan Mei]:  that is right

[Defendant]:  k

(Id., Ex. D.)  The pertinent portion of the second chat on July 31 reads as follows:

[Defendant]:  what you doing?

[Defendant]:  you took a nap?

[Yan Mei]:  no

[Yan Mei]:  I am modified the CRO business plan

[Defendant]:  good job, babe

[Defendant]:  :D

[Defendant]:  How did it go?

[Yan Mei]:  R&D plan almost done

[Yan Mei]:  CRO plan need final correction and format

[Defendant]:  Sound great

[Defendant]:  When you get bored, you can check some books of negotiation

[Defendant]:  and leadership

[Defendant]:  You need to build up thoese [sic] skills

[Defendant]:  be humble and receptive.  Don[']t assume you are naturally good

[Defendant]:  :)

[Yan Mei]:  thanks that is a good suggestion

[Defendant]:  ah!  Do it.  You just say "good ideas" but never really put into actions

[Yan Mei]:  :).  I will do it

[Defendant]:  Some people are naturally better than others in negotiation, building relatioship [sic] and leadership, but everyone has room to grow and improve

[Defendant]:  People skills is your strength among scientific PhDs

[Defendant]:  but you still have large room to improve

[Yan Mei]:  I will find some books

[Defendant]:  I understand it is very painful to write business proposal, one can get frustrated easily.  but please don[']t waste time on checking nonsence [sic]

[Defendant]:  spend time positively, like take a wal [sic], or reading some useful books

[Defendant]:  take a walk

(Id., Ex. E.)[20]

    In Defendant's Motion, she argues that these electronic chats are privileged because they

---

[20]   The end of the chat is not included in this Opinion because it is Defendant and Yan Mei discussing family plans.  (See Doc. No. 260, Ex. E.)  The omitted portion of the chat does not pertain to any alleged criminal activity and is therefore an inadmissible confidential marital communication that is subject to redaction.

"constitute[ ] general discussion[s] between Ms. Xi and her husband regarding her husband's activities, but does not evidence the furthering, promoting, helping, or advancing by Ms. Xi or Mr. Mei of any criminal activity." (Doc. No. 260 at 9.) "At most," Defendant believes the first chat "shows Ms. Xi's innocent awareness of the existence of a startup company involving Ms. Xue, Mr. Mei, and a third individual . . . but the conversation does not advance a crime." (Id.) She similarly states that the second chat "at most showed that Ms. Xi was aware that Mr. Mei planned a startup Contract Research Organization." (Id.) "The Superseding Indictment alleges that Ms. Xi suggested to Mr. Mei in this chat that he improve his negotiation skills as a way to further criminal activity at the startup, but when read in context[,]" Defendant believes "it is clear that was not the purpose of the communication." (Id. at 10.) Rather, "[t]he transcript shows that Ms. Xi took an interest in how Mr. Mei spent his time." (Id.)

The Government conversely avers that the crime-fraud exception applies to both chats since they were "in furtherance of the conspiracy and provide important context to understand their plan to steal GSK trade secrets, what they hoped to gain from the theft, and how the[y] planned on developing Renopharma." (Doc. No. 269 at 7.) Regarding the first chat, the Government submits that it shows Defendant and Yan Mei discussing co-Defendant Yu Xue's "future plans"—namely, how Xue "would stay employed with GSK long enough steal the information needed to solidify the status of their company, Renopharma, and to profit from this theft." (Id. at 6.) It further avers that Yan Mei "admi[tted] that once the stolen GSK data was resold and Renopharma began to profit, [Yu Xue] would quit working at GSK and work for Renopharma full-time[,]" and Defendant Xi "was in agreement that [Yu Xue] should remain at GSK until the necessary trade secret and confidential documents were stolen by [Yu Xue]." (Id.) Regarding the second chat, the Government contends that it shows Yan Mei "provid[ing] an update to [Defendant Xi] that he was

in the process of completing several plans for the development of Renopharma, including the business plan." (Id. at 7.) "In response, [Defendant Xi] encouraged [Yan Mei] to stay positive and focused, and to hone his negotiation and leadership skills so that he would succeed while working at Renopharma." (Id.)

When placed against the backdrop of all facts alleged in the Superseding Indictment and the other electronic chats at issue, the July 31, 2012 chats fall within the crime-fraud exception. Defendant Xi and Yan Mei are shown discussing co-Defendant Yu Xue's future plans, Renopharma's business proposal, and their plan to "get the money first"—all of which it is reasonable to infer were in furtherance of the alleged conspiracy.  (Doc. No. 260, Exs. D-E.) Defendant and Yan Mei's use of "our" and "we" in the chat further suggests "joint participa[tion] in criminal activity[.]" Tartaglione, 228 F. Supp. 3d at 408 n.3.  As such, the Government has met its prima facie burden of showing that the crime-fraud exception applies to the July 31, 2012 chats.

### b.    August 28, 2012 Electronic Chat

The pertinent portion of the August 28, 2012 electronic chat reads as follows:

[Defendant]: Yu is annoying recently

[Yan Mei]:  why?

[Defendant]:  She keeps complaining about this trip

[Defendant]:  why she is doing all this

[Yan Mei]:  she is nervous [sic]

[Defendant]:  and why she got herself into this weird situation....

[Defendant]:  I am annoyed by her

[Yan Mei]:  don't lose temper

[Defendant]:  en, I wont

[Defendant]:  she is the queen

38

> [Defendant]:  :)
>
> [Yan Mei]:  :)
>
> [Defendant]:  bye
>
> [Yan Mei]:  88
>
> [Defendant]:  hey
>
> [Defendant]:  Yu showed me an email she drafted
>
> [Defendant]:  I think you should take out the 10 to 25% out.  It is
>                       too much.  lets just use 30% as the starting point

(Doc. No. 260, Ex. F.)

Defendant maintains that "[t]here is nothing about th[e]se comments that furthers, promotes, or advances an illegal activity."  (Doc. No. 260 at 10.)  "In context," she contends that her referring to Yu Xue as "queen" was because in her opinion, "Ms. Xue liked to be in charge." (Id.)  And as for the "draft email regarding how much equity Mr. Mei and Ms. Xue intended to leave for future investors in their startup[,]" she avers that "[t]here is no evidence that [she] even knew Mr. Mei's business was for an allegedly illegal purpose."  (Id. at 11.)  In response, the Government asserts that the discussion about Yu Xue "demonstrate[s] [Yan Mei] and [Defendant Xi's] knowledge that [Yu Xue] was the critical piece of the conspiracy to steal information from GSK and that they must tolerate her idiosyncrasies in order to jointly profit from the theft of these trade secrets."  (Doc. No. 269 at 7.)  It also avers that the discussion of Yu Xue's draft email shows Defendant's "participation in the fraud conspiracy by reviewing [Yu Xue's] work and making suggestions regarding business operations."  (Id. at 8.)

As with the July 31, 2012 chats, the Government has met its prima facie burden of showing that the crime-fraud exception applies to the August 28, 2012 chat.  Defendant not only discusses

her frustrations with co-Defendant Yu Xue, but she also states that she reviewed one of Yu Xue's draft emails and then proceeds to make suggestions on how Yan Mei should change percentages in the draft.  (See Doc. No. 260, Ex. F.)  Therefore, at the prima facie level, Defendant Xi and Yan Mei's communication in the August 28, 2012 chat was in furtherance of the alleged conspiracy.

### c.      September 4, 2012 Electronic Chat

The last electronic chat at issue occurred on September 4, 2012 and reads as follows:

> [Defendant]:  are u there>?
>
> [Defendant]:  You need to practice before you present
>
> [Defendant]:  I told Yu that you did not send copy to her because Tao wants to combine yours with his and then Tao will send it to Yu
>
> [Defendant]:  Be careful in the future.  Dont disappoint me anymore
>
> [Defendant]:  it is really stupid the way you handle stuff.
>
> [Defendant]:  Why Tao combines both parts?
>
> [Defendant]:  That will leave you very 被动[21]

(Doc. No. 260, Ex. G.)

Defendant explains that this electronic chat "pertains to a presentation by Mr. [Yan] Mei with Mr. [Tao] Li and Ms. [Yu] Xue[,]" and that she "disagreed with how Mr. Mei had decided to handle the situation and, in particular, that Mr. Li would be put in charge of 'combin[ing] both parts.'"  (Doc. No. 260 at 11) (fifth alteration in original).  Defendant also "was 'disappoint[ed]' by this decision because it would leave Mr. Mei no time 'to practice before [he would] present.'"  (Id.) (alterations  in  original).  Nevertheless,  she  maintains  that  "these  are  innocuous

---

[21]  This  text  translates  to  the  adjective  "passive."  See  Google  Translate, https://translate.google.com/?hl=en&sl=zh-CN&tl=en&text=被动&op=translate (last visited Sept. 1, 2021).

communications between two spouses" and are "not communications furthering, promoting, or advancing a criminal activity" because "[s]he was not involved in the presentation whatsoever" and "[h]er primary concern [only] was that Mr. Mei present well and have a fair opportunity to do so in the context of a group presentation for Mr. Mei's startup company." (Id.)  Defendant further suggests that the electronic chat "demonstrates [her] distance from any criminal activity because it shows that she was unaware as to how Mr. Mei, Ms. Xue, and Mr. Li agreed to conduct their preparation for the presentation." (Id.)

The Government conversely describes this electronic chat as Defendant "continu[ing] to press [Yan Mei] about his Renopharma work." (Doc. No. 269 at 8.)  It avers that Defendant and Yan Mei "were clearly aware of the Renopharma conspiracy based on their discussions of combining [Yan Mei] and [Tao] Li's Renopharma presentation before sending to [Yu Xue]." (Id.)  Defendant Xi "also instructed [Yan Mei] to practice his Renopharma presentation and chides him for how he handled a Renopharma-related matter." (Id.)  The Government thus avers that "[t]his discussion was in furtherance of the ongoing criminal activity and shows the joint effort by [Defendant Xi] and [Yan Mei] to develop Renopharma." (Id.)

The July 31 and August 28, 2012 chats lead this Court to conclude that the September 4, 2012 chat also is admissible under the crime-fraud exception.  For prima facie purposes, all of the electronic chats show Defendant guiding, advising, and directing her then-husband, co-Defendant Yan Mei, on how to work with the other co-Defendants to build a successful company in Renopharma.  The September 4, 2012 chat specifically shows Defendant criticizing Yan Mei, as she said it was "really stupid the way [he] handle[d] stuff" and told him not to "disappoint [her] anymore[.]" (Doc. No. 260, Ex. G.)  The chat also makes clear that Defendant communicated with co-Defendant Yu Xue and either communicated with, or at least knew of, co-Defendant Tao Li's

role in preparing a business presentation for Renopharma.  (See id.)  When viewed in context, the

Court can infer from the September 4, 2012 electronic chat that Defendant was fully aware of—

and was involved in—the business plans for Renopharma.  In other words, the chat was a

communication in furtherance of the alleged conspiracy.

Accordingly, the Government has met its prima facie burden of showing that the crime-

fraud exception applies to the September 4, 2012 electronic chat.

### d.      October 11, 2013 Email

Lastly, as noted in Section III.B.1.c, supra, the October 11, 2013 email shows Defendant

Xi forwarding a news article to Yan Mei with the subject line: "FW: 2 former Eli Lilly scientists

indicted on charges of stealing trade secrets."  (Doc. No. 260 at 11.)  Defendant summarizes the

contents of the email as follows:

> The first email in the chain, sent by one Asian American GSK
> employee to Ms. Ren Xie, the chair of GSK's Asian Employee
> Association, includes a link to the Indianapolis Star's digital
> publication of an article entitled "2 former Eli Lilly scientists
> indicted on charges of stealing trade secrets." (Yaffe Decl. Ex. H at
> USAO000279.)  The first email in the chain states: "[w]ant your
> opinion on this. Is it appropriate for you to forward this article to
> GSK Chinese community?  Do not want to offend anyone, but I
> thought it is a good learning for all of us.  BTW, I got it from Mike."
> (Id.)  In the second email in the chain, Ms. Xi forwards the first email
> to 181 employees in GSK's Chinese community. (Id. at
> USAO000280.)  In the third email in the chain, Ms. Xi forwards the
> email to Mr. Mei.  (Id.)

(Id. at 11-12.)

Defendant notes that "[t]he email from Ms. Xi to Mr. Mei does not have a message in the

body of the email[,] and "[t]he purpose of [her] email was clearly to raise awareness of an issue

affecting the Chinese community and for 'good learning' to occur." (Id. at 12.) As such, she asserts

that "the [G]overnment cannot meet its burden of showing that this email furthered, promoted, or

advanced any criminal activity, let alone that it was even related to any criminal activity."  (Id.)

The Government conversely avers that the email "is admissible not only because it does not qualify as a confidential marital communication, . . . but also because the communication was in furtherance of the conspiracy." (Doc. No. 269 at 9.) "While the defense focuses on the fact that [Defendant Xi] did not write a message in the body of the e-mail, the logical inference from this e-mail is that [she] knew that [Yan Mei] was participating in a conspiracy to steal trade secrets from GSK and that the e-mail from [Defendant Xi] to [Yan Mei] constituted a warning to be careful about this criminal conduct[.]" (Id.)

To begin with, the email is not a traditional "communication" because Defendant merely forwarded an email to Yan Mei and did not write anything in the body of the email. See Pereira, 347 U.S. at 6 ("The privilege, generally, extends only to utterances, and not to acts."). As previously noted, however, the Third Circuit has acknowledged that in "rare instances," the privilege can extend to conduct "intended to convey a confidential message from the actor to the observer." Hill, 967 F.2d at 911 n.13 (quotations and citation omitted). When the October 11, 2013 email is viewed in context and in conjunction with all other evidence, the Court can infer that Defendant's act of forwarding a news article about Eli Lilly scientists indicted for stealing trade secrets was intended to convey a confidential message to Yan Mei. As the Government wrote in its Response, Defendant's email can be construed as "a warning about the potential repercussions of their illegal activity." (Doc. No. 269 at 9.)

But the parties additionally and alternatively dispute whether the email was confidential, and thus privileged, because the email was sent from Defendant's GSK email address. (See Doc. Nos. 260 at 3-5; 269 at 10-13.) The parties both point to the four-factor test set forth in In re Asia Global Crossing, Ltd., 322 B.R. 247 (Bankr. S.D.N.Y. 2005) for assessing an employee's reasonable expectation of privacy in their emails: "(1) [whether] the corporation maintain[s] a

policy banning personal or other objectionable use, (2) [whether] the company monitor[s] the use of the employee's computer or e-mail, (3) [whether] third parties have a right of access to the computer or e-mails, and (4) [whether] the corporation notif[ies] the employee, or [whether] the employee [is] aware, of the use and monitoring policies[.]"   322 B.R. 247, 257.   Both parties contend that the factors weigh in their favor.   (See Doc. Nos. 260 at 4; 269 at 11.)

It is important to note that this Court is not obliged to apply the In re Asia Global Crossing four-factor test, as the decision is not binding precedent.   Notably, however, the court in In re Asia Global Crossing cited a number of cases it relied upon in formulating the four-factor test, see 322 B.R. at 257-58, and cited one case from this District which provides helpful guidance.   See Smyth v. Pillsbury Co., 914 F. Supp. 97 (E.D. Pa. 1996).   In Smyth, the court held that the plaintiff-employee did not have a reasonable expectation of privacy "in e-mail communications voluntarily made . . . to his supervisor over the company e-mail system notwithstanding any assurances that such communications would not be intercepted by management."   914 F. Supp. at 101.   "Once plaintiff communicated . . . to a second person (his supervisor) over an e-mail system which was apparently utilized by the entire company," the court found that "any reasonable expectation of privacy was lost."   Id.

After Smyth, another court in this District similarly held that the plaintiff "did not have a reasonable expectation of privacy with respect to her e-mail" because her employer's email guidelines stated, inter alia, that it "reserve[d] the right to access and disclose the contents of all messages created, sent, or received using the e-mail system."   Kelleher v. City of Reading, No. 01-3386, 2002 WL 1067442, at *8 (E.D. Pa. May 29, 2002).   The court thus held that the employer's guidelines "explicitly informed employees that there was no such expectation of privacy" in their emails, and held that the plaintiff did not have an expectation of privacy because she "signed an

acknowledgment that she had received and read the Guidelines[.]"  Id.

Based on the reasoning in Smyth and Kelleher, Defendant Xi's October 11, 2013 email to Yan Mei is not privileged because Defendant Xi does not have a reasonable expectation of privacy in emails sent from her GSK email address.  As in Smyth, Defendant voluntarily forwarded the email to Yan Mei.  And as in Kelleher, Defendant signed GSK's "Conditions of Employment" form, which included an "Acceptable Use of IT Resources" section stating that "GSK may for any reason at its sole discretion, monitor electronic communications (including e-mail correspondence) on or transmitted by GSK IT resources at anytime, including during or after transmission."  (Doc. No. 260, Ex. B at 3; see also Doc. No. 125 at 8 ¶ 16.)

In any event, regardless of whether the email is privileged, the Government has met its prima facie burden of showing that the crime-fraud exception applies.  It bears repeating that, "to invoke the exception, the [G]overnment must make a prima facie showing that (1) the [defendant] was committing or intending to commit a fraud or crime, . . . and (2) the [spousal] communications were in furtherance of that alleged crime or fraud[.]"  In re Grand Jury Subpoena, 223 F.3d at 217.

As to the first prong, it is evident that the allegations in the Superseding Indictment show that the conspiracy existed from approximately 2012 to 2016.  (See Doc. No. 125 at 8 ¶ 18; 28 ¶ 7; 43-44 ¶¶ 88-95.)  The Government has thus made a prima facie showing that Defendant Xi was committing a crime at the time she sent the October 11, 2013 email.  The Government has also made a prima facie showing as to the second prong.  In its Response to the Motion, it submits that "[t]his e-mail puts into context [Defendant Xi's] fear and concern about the potential repercussions for getting caught for the very crime her and her co-conspirators were committing" and it "constituted a warning to be careful about th[e] criminal conduct[.]"  (Doc. No. 269 at 9.) Indeed, when viewed in context and in conjunction with all other evidence, this email "intended

to convey a confidential message" that "pertain[ed] to ongoing or future criminal activity[.]"  Hill, 967 F.2d at 911 n.13; see also Ammar, 714 F.2d at 258.[22]

For all the above reasons, the crime-fraud exception applies to the July 31, 2012, August 28, 2012, and September 4, 2012 electronic chats, and the October 11, 2013 email.  Accordingly, Defendant's Motion to Suppress Confidential Marital Communications (Doc. No. 260) will be denied.

## IV.    CONCLUSION

For the foregoing reasons, the Government's Motion in Limine (Doc. No. 210) will be granted.  Defendant Lucy Xi's Motions (Doc. Nos. 214, 217, 260, 374) will be denied, except for her Motion in Limine for Admission of Judicial Admissions (Doc. No. 216), which will be denied without prejudice.  An appropriate Order follows.

---

[22]  At trial, Defendant Xi may argue that the email and chats have a different meaning than the ones ascribed by the Government.  The question of which meaning to adopt is for the jury to decide.